Oscar HINES, Appellant,

v.

**CONSOLIDATED RAIL CORPORATION**

v.

**GENERAL ELECTRIC COMPANY, Monsanto Company, and Penn Central Corporation.**

No. 89–1350.

United States Court of Appeals, Third Circuit.

Submitted Nov. 16, 1989.

Decided Feb. 13, 1991.

F.Supp. 127, 131 (M.D.Fla.1986); *Tyer v. United States,* 645 F.Supp. 1528, 1532 (N.D.Miss.1986).

Allan Kanner, Allan Kanner & Associates, Philadelphia, Pa., for appellant.

David Richman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee Consol. Rail Corp.

Harry A. Short, Jr., Liebert, Short & Hirschland, Philadelphia, Pa., John G. Kester, Williams & Connolly, Washington, D.C., for appellee General Elec. Co.

Michael H. Malin, James D. Shomper, White and Williams, Philadelphia, Pa., for appellee Monsanto Co.

Roger F. Cox, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellee Penn Central Corp.

Before HIGGINBOTHAM, and SCIRICA, Circuit Judges, and POLITAN, District Judge*.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

Oscar Hines filed suit against Consolidated Rail Corporation ("Conrail") under the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (1988) ("FELA"), alleging that negligent workplace exposure to Polychlorinated Biphenyls (PCBs)[1] and possibly other toxic chemicals during the course of his employment with Conrail caused him to develop bladder cancer and other ailments. Hines' case was transferred to the same district court judge deciding *In re Paoli Railroad Yard PCB Litigation*, 706 F.Supp. 358 (E.D.Pa.1988), *rev'd*, 916 F.2d 829 (3d Cir.1990), a related group of 21 cases consolidated for case management purposes.

*Paoli* involved 38 plaintiffs who alleged that their injuries resulted from exposure to PCBs either at or near the Paoli, Pennsylvania railyard, a maintenance facility for electric railcars. In contrast to this case, the plaintiffs in *Paoli* did not sue under FELA but instead in tort alleging that they were exposed to abnormally high levels of PCBs and that this exposure caused their injuries.

In *Paoli*, the district court appeared to exclude under Fed.R.Evid. 702, 703, and 403, or ascribe little weight to, most of plaintiffs' expert testimony on PCB exposure and causation and granted summary judgment for defendants. Yet the district court held that even if the excluded evidence were admitted, summary judgment would still be appropriate because of the absence of a genuine issue of material fact necessary to establish causation for a toxic tort under Pennsylvania law.

Thereafter, Conrail moved for summary judgment in this case on grounds similar to those presented in *Paoli*, contending, in particular, that the testimony of Hines' only expert witness, Harry Shubin, M.D., an internist, who had also testified in *Paoli*, was inadmissible under Fed.R.Evid. 702, 703, and 403. Furthermore, Conrail argued that even if Shubin's testimony were admissible, it would not support a *prima facie* case for causation because Shubin had not adequately established that Hines had been exposed to PCBs or that PCBs were a possible cause of Hines' medical problems. In response, Hines maintained that scientific evidence and judicial precedent established that PCBs are toxic, that Shubin's expert testimony demonstrated that Hines' injuries were due to PCB exposure, and that his case was different from *Paoli* because FELA actions are based on a

---

* The Honorable Nicholas H. Politan, United States District Judge for the District of New Jersey, sitting by designation.

1. PCBs, which were discovered over 100 years ago, are a family of 209 chemical compounds. In 1929, PCBs started to be heavily used as coolants and lubricants in transformers and other electrical equipment because they are highly insulating and flame retardant. At this time, however, there is no longer commercial production of PCBs in the United States. L. Flynn, PCBs: A Report by the American Council on Science and Health 2 (1986). We have noted that "PCBs are extremely hazardous chemicals." *In re Quanta Resources Corp.*, 739 F.2d 912, 913 (3d Cir.1984) (referencing some of the many federal, state, and local laws controlling the storage and disposal of PCBs).

more lenient standard of causation and negligence than ordinary tort actions.

The district court granted Conrail's motion for summary judgment in an order without opinion.[2] We held Hines' appeal C.A.V. pending our review of *Paoli* which we reversed and remanded.

Our reversal of *Paoli* was based on several factors, most particularly, the district court's failure to: 1) give plaintiffs a sufficient opportunity to present their arguments on evidentiary issues, 2) explain adequately the reasons for its rulings, 3) follow this court's established guidelines for evidentiary rulings governed by Fed.R. Evid. 702, 703, and 403, and 4) apply appropriately the test for the admissibility of novel scientific evidence under Fed.R.Evid. 702 and *United States v. Downing*, 753 F.2d 1224 (3d Cir.1985).

As we have noted, the district court did not supply an opinion in this case. Our analysis therefore will proceed on the reasons set forth by the district court in *Paoli.* On the basis of our opinion in *Paoli,* and additional arguments, we will reverse and remand.

## I. FACTS AND BACKGROUND

Since 1964, Hines has been employed as a railway laborer, which included occasional work in the Paoli railyard. From 1964 to 1976 he was employed by the Pennsylvania Railroad and its successor, Penn Central; since 1976, by Conrail. Hines' work consisted primarily of maintaining railroad tracks both manually and with a regulator that sweeps material from the tracks and ties. During this time, Hines worked, ate, and slept in railyards and camps. In June, 1987, Hines was diagnosed as having bladder cancer. In addition, he developed chronic obstructive and restrictive lung disease and a number of other medical problems.

Hines contended that his injuries were due to his exposure to PCBs and other toxic chemicals during his work in railyards even though he had had only limited contact with the Paoli railyard. Shubin stated that this exposure resulted from the PCBs that were used as dielectric fluid in railroad car transformers and those that leaked onto track beds. Shubin also stated that Hines was affected by his inhalation of heavy dust contaminated with PCBs while he was operating a regulator. In general, then, Hines alleged that his injuries were the direct result of his employer's negligence in exposing him to PCBs from 1964 to the present and in failing to warn him of the presence of PCBs and their risks to his health.

Hines and the *Paoli* plaintiffs had comparable backgrounds. The *Paoli* plaintiffs claimed that their exposure to PCBs had resulted from having worked or resided near the Paoli railyard. Since the 1930s, the railyard, a regional maintenance facility for different rail companies, stored and disposed of PCBs that were used as dielectric fluid in the transformers on railroad cars. Thus, because PCBs have been used in the Paoli railcar transformers for decades, they "can be found in extremely high concentration at the railyard and in the ambient air and soil." *Paoli,* 916 F.2d at 835.

The five *Paoli* defendants were Monsanto Corporation, which is the country's leading manufacturer of PCBs; General Electric Company, which manufactures the transformers; Amtrak, which owned the railyard since 1976; Conrail, which operated the railyard between 1976 and 1983; the Southeastern Pennsylvania Transit Authority, which has operated the railyard since 1983; and the City of Philadelphia, which owns some of the facility's railroad cars.

The parallels between *Paoli* and this case will be analyzed with respect to the requirements of Fed.R.Evid. 702, 703, and

---

2. At the time the district court issued its grant of summary judgment, we had not articulated our policy, subsequently announced in *Vadino v. A. Valey Engineers,* 903 F.2d 253 (3d Cir.1990): "[W]e will exercise our supervisory power to require the district courts in this circuit to accompany grants of summary judgment hereaf-

ter with an explanation sufficient to permit the parties and this court to understand the legal premise for the court's order." *Id.* at 259. Accordingly, we do not criticize the judgment of the district court on the grounds that no opinion was written.

403, and the more liberal standards of negligence and causation set forth under FELA. Although there were two FELA cases in *Paoli*, the FELA standard was not addressed. We emphasize that in the absence of a district court opinion, much of our discussion is based upon our projection of what the district court might have held had it followed its *Paoli* rationale.

## II. OVERVIEW OF THE SUBMITTED EVIDENCE

### A. *Evidence Submitted in* Paoli

In order to demonstrate that their personal injuries were attributed to their exposure to the PCBs in the Paoli railyard, the *Paoli* plaintiffs introduced, in addition to Shubin, a total of eight expert witnesses: Herbert Allen, Ph.D., a chemist; Deborah Barsotti, Ph.D., a toxicologist; Benjamin Calesnick, M.D., a pharmacologist; G. John DiGregorio, Ph.D., M.D., a clinical pharmacologist; William J. Nicholson, Ph.D., a physicist; Ian C.T. Nisbet, Ph.D., the president of a scientific consulting firm; Robert K. Simon, Ph.D., an industrial hygienist, toxicologist, and forensic analytic chemist; and Arthur Zahalsky, Ph.D., an immunologist. All experts had either an accredited Ph.D. or M.D., an established institutional affiliation, and scholarly expertise.

Shubin's testimony alone was used for three plaintiffs. Shubin's conclusion that plaintiffs' illnesses and conditions that he had diagnosed were caused by their exposure to PCBs was based upon a number of different sources: his physical examination of the plaintiffs, their medical records and laboratory test results, "numerous published studies and reports," as well as information from the Environmental Protection Agency stating that PCB-contaminated soil had been removed from the residence of one of the plaintiffs.

The other eight experts offered a wide range of testimony on the nature and extent of PCB exposure on plaintiffs in addition to the effect that such exposure may have on different injuries and ailments. The district court focused primarily on three sources which plaintiffs' experts used to support their testimony: 1) animal studies presumably showing the harmful effects of PCB exposure, 2) studies using data from the Yusho and Yu Cheng incidents in Japan and Taiwan,[3] and 3) experts' own opinions and research. We note the extent to which any particular test or testimony becomes relevant in our discussion of this case.

### B. *Evidence Submitted in This Case*

In this case, Shubin reviewed information that was comparable to the information that he examined for his testimony in *Paoli*. Shubin's evaluation was derived from five different sources: 1) a medical examination of Hines, his personal and family histories; 2) various medical tests, including chest X-rays, pulmonary function studies, a coronary risk profile, arterial blood-gas studies, and a lab scan; 3) a laboratory report performed by National Medical Services that showed that Hines' "PCB fat level" was 1100 parts per billion while the norm was less than 1000 parts per billion;[4]

---

**3.** In the Yusho incident in Japan and the Yu Cheng incident in Taiwan, many people, and their offspring, suffered acute health effects after eating food cooked with rice oil contaminated with Kanechlor, a Japanese PCB compound, which also contains a high concentration of polychlorinated dibenzofurans (PCDFs). Kimbrough, *Polychlorinated Biphenyls: How Do They Affect Human Health?*, 2 Health & Env't Digest 1, 2 (1988).

**4.** Shubin gave Hines both PCB blood tests and PCB fatty tissue tests although only Hines' PCB fat level appeared to show a difference from that reported for the normal population. The significance of this difference was contested by Conrail. The method of estimating PCB exposure based upon PCB levels in blood or in fatty tissue, or in a ratio calculation of the levels in blood and fatty tissue, was a controversial issue in *Paoli* that defendants also raised in this case.

In *Paoli*, most plaintiffs had PCB blood tests whereas only a few had PCB fatty tissue tests. The Paoli Exposure Study of the Agency for Toxic Substances and Disease Registry (the ATSDR Study), which the district court and the defendants referenced in *Paoli*, relied on blood tests and not upon fatty tissue tests. Nisbet contended that by taking the blood test results of the *Paoli* plaintiffs and those individuals who participated in the ATSDR Study, and applying his formula to determine the PCB content of their fatty tissue, the resulting PCB level will be "much higher" than the general background lev-

4) reports prepared by Hines' treating physicians; and 5) Hines' hospital records and occupational history. Shubin also reviewed scientific articles and administrative findings on the toxicity of PCBs.[5] Based upon this evidence, Shubin concluded that Hines' injuries included cancer of the bladder, chronic obstructive and restrictive lung disease, and a number of other ailments.

### III. STANDARD OF REVIEW

■■■ Our standard of review of the entry of summary judgment is plenary. We apply the same standard as that employed by the district court. *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1093 (3d Cir.1988). Summary judgment is appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). We review a district court's decision to exclude expert testimony for abuse of discretion. *Pfeiffer v. Marion Center Area School Dist.*, 917 F.2d 779, 781 (3d Cir.1990); *Hill v. Equitable Trust Co.*, 851 F.2d 691, 699 (3d Cir.1988), *cert. denied*, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989).

### IV. SUMMARY JUDGMENT STANDARD UNDER FELA

■■ This case differs from *Paoli* because Hines sued under FELA which has a more lenient standard for determining negligence and causation. Under FELA, every railroad engaging in interstate commerce is liable in damages to any employee injured during his employment when

> such injury ... result[ed] in whole or in part from the [railroad's] negligence ...

el reported in a fatty tissue study conducted by the Environmental Protection Agency (the National Human Adipose Tissue Survey). *Paoli*, 706 F.Supp. at 364–65, 371.

5. Shubin indicated that he would bring additional articles upon which he relied for his conclusions to the second half of his deposition.

or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51 (1988).

FELA was passed in 1908 in an effort to provide a tort compensation system for railroad workers who, at that time, experienced among the highest accident rates in United States history. Schwartz & Mahshigian, *The Federal Employers' Liability Act, a Bane for Workers, a Bust for Railroads, a Boon for Lawyers*, 23 San Diego L.Rev. 1, 3 (1986). In a series of decisions starting with *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) and then followed, most notably, by *Gallick v. Baltimore & Ohio Railroad*, 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963), the Supreme Court broadened FELA's standards of fault and proximate cause. *See* Phillips, *An Evaluation of the Federal Employers' Liability Act*, 25 San Diego L.Rev. 49, 51 (1988). In *Rogers*, the Court held that "the test of a [FELA] jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers*, 352 U.S. at 506, 77 S.Ct. at 448. Moreover, the Court held that it was irrelevant whether the jury could also "with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence." *Id.* (footnote omitted). Similarly, in *Gallick*, the Court stated that there can be a jury question of causation when there is "evidence that *any* employer negligence caused the harm, or, more precisely, enough to justify a jury's determination that employer negligence had played *any* role in producing the harm." *Gallick*, 372 U.S. at 116, 83 S.Ct. at 664.

However, he had major surgery in January and was not scheduled to return to his practice until April, 1989, at the earliest. Thus, the second half of his deposition was not resumed prior to the filing of Conrail's motion for summary judgment. Brief for Appellant at 32 n. 36.

Reasonable foreseeability of harm is an "essential ingredient" of FELA cases. *Gallick*, 372 U.S. at 117, 83 S.Ct. at 665. However, the *Gallick* Court adopted a broad interpretation. The Court held that regardless of whether the railroad could have foreseen the employee's injury (amputation of both legs) that appeared to result from an infectious insect bite, the jury's finding that the railroad was negligent in maintaining a stagnant and infested pool of water that attracted insects was sufficient to satisfy the foreseeability requirement. *Id.* at 109–13, 83 S.Ct. at 661–63. In turn, the question of "whether or not the insect was from or had been attracted by the pool" of stagnant water was answered by plaintiff's testimony that he had seen similar types of insects in the pool. *Id.* at 113, 83 S.Ct. at 663.

Medical witnesses in *Gallick* also testified that such pools attracted and breed insects. *Id.* However, none of the doctors who treated the plaintiff could explain the etiology of his amputation, although some of them said that it was secondary to an insect bite. *Id.* at 109–10, 83 S.Ct. at 661–62. This kind of circumstantial evidence was held to be sufficient to support a causal inference. *Id.* at 117–22, 83 S.Ct. at 665–68. The results of *Rogers, Gallick*, and subsequent decisions, then, have led to the conclusion that the Supreme Court has applied a broad interpretation of causation under FELA.

Similarly, in *Pehowic v. Erie Lackawanna R.R.*, 430 F.2d 697 (3d Cir.1970), we stated that a FELA plaintiff need only present a minimum amount of evidence in order to defeat a summary judgment motion. "[A] trial court is justified in withdrawing ... issue[s] from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee." *Id.* at 699–700. *See also Eckert v. Aliquippa & Southern R.R.*, 828 F.2d 183, 187 (3d Cir.1987) (holding that, under *Pehowic*'s "zero probability" test, the district court judgment should be reversed and remanded so that the Jones Act plaintiff could introduce evidence); *Gans v.*

*Mundy*, 762 F.2d 338, 343–44 (3d Cir.1985) (citing *Pehowic* test for determining liability under FELA); *Southard v. Independent Towing Co.*, 453 F.2d 1115, 1118 (3d Cir.1971) (citing *Pehowic* test for determining liability in a Jones Act case). Notably, in Conrail's reference to our perspective on excluding evidence under FELA, Conrail refers only to Third Circuit cases that preceded the *Pehowic* "zero probability" test. *See* Brief for Appellee at 37.

The concept of causation under FELA is also broadly interpreted. For example, the injury need not be an immediate result of an accident. *See, e.g., Urie v. Thompson*, 337 U.S. 163, 187, 69 S.Ct. 1018, 1033, 93 L.Ed. 1282 (1949) (allowing silicosis, caused by the inhalation of silica dust over a period of thirty years, to be compensable under FELA).

Moreover, a medical expert can testify that there was more than one potential cause of a plaintiff's condition. In *Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959), for example, a seaman brought suit under the Jones Act (which specifically incorporates FELA) seeking damages for a tubercular illness that he claimed was caused by an accident that activated or aggravated a latent tubercular condition. None of the three medical witnesses testified that the accident in fact caused the illness. The first witness testified that the tuberculosis might be a consequence of the accident. The second witness stated that the accident and the plaintiff's pre-existing diabetic condition most likely aggravated the tuberculosis, although he could not determine which of the two was more responsible. The third witness, who had not personally examined the plaintiff, suggested that the accident "probably aggravated" the plaintiff's condition, although he would not say definitely. *Id.* at 109, 80 S.Ct. at 174.

Despite this lack of medical unanimity over the particular cause of the illness, the Court concluded that the differences in testimony did not impair the jury's ability to draw causal inferences. Furthermore, the

Court recognized the general reluctance among experts to state that a trauma was the cause of a disease. *Id.* at 109 & n. 2, 80 S.Ct. at 175 & n. 2. As the Court explained, "[t]he matter does not turn on the use of a particular form of words by the physicians in giving their testimony," since it is the task of the jury and not the medical witnesses to make a legal determination regarding causation. *Id.* at 109, 80 S.Ct. at 175.

■ We agree with Hines that the standard under FELA can significantly influence a determination of the admissibility of Shubin's testimony. By enacting FELA, Congress desired to "secure jury determinations in a larger proportion of cases than would be true of ordinary common law actions." *Boeing Co. v. Shipman,* 411 F.2d 365, 371 (5th Cir.1969) (en banc). Indeed, jury determinations were intended to be part of the FELA remedy. *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines,* 369 U.S. 355, 360, 82 S.Ct. 780, 7, 7 L.Ed.2d 798 (1962).

## V. EVIDENCE REVIEWED UNDER FED.R.EVID. 703

### A. *Factual Findings*

■ Fed.R.Evid. 703 delineates the proper foundation for expert testimony.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

We have noted that a district court must have a proper factual foundation to make conclusions about admissibility. *In re Japanese Elec. Prods. Antitrust Litig.,* 723 F.2d 238, 276–77 (3d Cir.1983), *rev'd on other grounds sub nom., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 1. Evidence Reviewed in Paoli

The *Paoli* defendants based their motion for summary judgment on two arguments: Expert testimony should have been excluded under Fed.R.Evid. 702, 703, and 403; and defendants' own submitted studies and expert testimony on PCB exposure and causation did not confirm the evidence that was submitted by plaintiffs. *Paoli,* 916 F.2d at 841. We concluded that because *Paoli* was decided at the summary judgment stage, "where credibility determinations are inappropriate," the evidence regarding exposure and causation "is significant only insofar as it relates, within the contours of our Rule 703 jurisprudence, to whether certain of plaintiffs' expert opinions should have been excluded because they were not based on facts or data reasonably relied on by experts in the field." *Id.* at 841–42.

With regard to the issue of PCB exposure, defendants and their own experts challenged the reliability and validity of the testimony of all plaintiffs' experts. *Id.* at 842–44. Defendants made two claims against Shubin's testimony on causation: "(1) his diagnosis conflicted with the diagnoses of other physicians who had previously examined patients, and (2) his diagnosis was based on a method that improperly assumed the injuries to be caused by PCBs." *Id.* at 844 (citations omitted). In order to support these claims, defendants questioned the validity of Shubin's testimony based upon the three plaintiffs he diagnosed. First, they contended that Shubin's conclusion that the first plaintiff's hypertension was caused by PCB exposure failed to consider other possible causal factors, such as the plaintiff's family history of hypertension. Moreover, Shubin could not cite any studies demonstrating a direct causal relationship between PCB exposure and hypertension. Shubin also attributed the plaintiff's death to PCB exposure even though previous doctors had determined that the death had been caused by the plaintiff's use of psychotropic drugs. *Id.*

Similarly, defendants argued that there was no support for Shubin's conclusion that the second plaintiff's four spontaneous

abortions or the third plaintiff's various illnesses, were related to PCB exposure. For example, Shubin had found no PCBs in the third plaintiff's blood nor did he dismiss other possible causes of the plaintiff's illnesses, such as the plaintiff's cigarette smoking. Defendants also criticized Shubin's reference to animal studies and the Yusho and Yu Cheng incidents. *Id.* In general, defendants' experts "characterized [Shubin's] opinions as 'conjectural guesses,' which 'fail adequately to consider multiple etiologic factors, as well as obvious differential diagnoses,' and 'would not withstand review by a qualified panel of his peers.'" *Id.* (citations omitted).[6]

We concluded, however, that defendants' attempts to exclude plaintiffs' expert witness testimony were not warranted under the *Japanese Electronics* standard. We noted in *Paoli* that the *Japanese Electronics* standard does not require a district court to hold an *in limine* or other type of hearing in order to conduct a "factual inquiry." However, we did "make clear ... that the district court must have a proper and reviewable foundation for making its admissibility findings." *Paoli*, 916 F.2d at 853. With regard to the *Paoli* defendants' submissions, though, we concluded that we could "identify no such foundation here." *Id.*

An example directly relevant to this case was our determination that the district did not identify the source of the "consensus conclusion from the scientific literature" that it relied upon in excluding opinions based upon the Yusho and Yu Cheng incidents (which Shubin referenced). Nor did the district court even specify which particular opinions it was excluding based upon its conclusions. For these reasons, we con-

cluded that those rulings that did satisfy Fed.R.Evid. 703 were to be reconsidered in the remanded proceedings according to the *Japanese Electronics* standard. *Paoli*, 916 F.2d at 853–54.

### 2. Evidence Reviewed in This Case

Conrail's motion for summary judgment was based on the grounds that there was no genuine issue of material fact that Hines' exposure to PCBs or other toxic chemicals during his employment with Conrail caused his injuries. In particular, Conrail contended that Shubin's testimony on causation was inadmissible because his opinions were without foundation and the evidence is "equivocal."

First, Conrail argued that Shubin had no clear evidence that Hines was ever exposed to PCBs before or during his employment with Conrail. Although Shubin suggested that Hines was exposed to the PCBs that were used as dielectric fluid in railroad car transformers, Shubin also noted that Hines never filled transformers with PCB fluid and never removed the fluid from the transformers. Shubin also presented no information regarding the presence or concentration of PCBs on any part of the railroad track where Hines worked, although he assumed that Hines was exposed to the PCBs that leaked onto track beds.

Second, the testing for PCB concentration in Hines' blood and fat showed that Hines had not been exposed to a greater concentration of PCBs relative to the general population. Third, although Hines implicates PCBs and possibly other toxic chemicals for his bladder cancer, Hines had also been a heavy cigarette smoker. Shu-

---

**6.** The terms "differential diagnosis" are used to describe a process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes (*e.g.*, other than exposure to PCBs) of the injuries at issue. *Paoli*, 916 F.2d at 849. In noting that the plaintiffs' medical experts failed to make differential diagnoses, the district court gave the example of an expert who testified that a plaintiff's asthma may have been caused by PCBs. However, when asked why the asthma could not have been attributed to another possible cause, "the expert has no intelligible response." The

district court concluded that this was "fatal to the plaintiffs['] claim." The district court did acknowledge that the experts with Ph.D.s attempted to make differential diagnoses, although the court thought that they were not qualified to do so. *Paoli*, 706 F.Supp. at 376. We concluded, however, that, in line with the liberal policy of Fed.R.Evid. 702, the differential diagnoses submitted by non-medical doctors are not "invalid simply because they were performed by non-physician experts." *Paoli*, 916 F.2d at 862.

bin conceded that individuals with comparable smoking habits have an elevated risk of bladder cancer and could also contract bladder cancer solely from exposure to cigarette smoke.

Furthermore, Conrail relied on two affidavits to support its contention that Shubin's opinions contradicted standard medical and scientific opinions on the effects of PCB exposure. The first affidavit, also filed by the defendants in *Paoli*, was signed by eleven medical doctors and scientists. They stated that based on their review of the literature on PCBs, no evidence existed for determining that PCBs cause cancer or other types of disorders, such as hypertension or cardiovascular disease. The second affidavit, provided by Kenneth H. Chase, M.D., F.A.C.P.M., whose practice involves the evaluation of persons exposed to PCBs, concluded that there was no evidence that linked PCBs to bladder cancer or to any of the other complications that Hines suffered.

In contrast, according to Conrail, Shubin provided no scientific or medical authority supporting his conclusion that exposure to PCBs was associated with any of Hines' ailments. Moreover, none of the articles he presented reported any epidemiological findings, apart from those that resulted from animal studies or from the Yusho and Yu Cheng incident, demonstrating that PCBs were a definitive carcinogen.

Conrail also emphasized that its expert, Chase, concluded from the PCB blood and fat level tests performed on Hines that Hines was not exposed to a greater level of PCBs than the general population. Furthermore, according to Conrail, whereas Chase had studies to support his conclusion, Shubin cited no reliable evidence to support his own. Shubin was also unable to conclude that any chemicals other than PCBs caused Hines' injuries because Shubin cited no medical or scientific references to support such an association and also did not indicate that Hines had been tested for exposure to any chemicals other than PCBs.

Conrail also argued that in order for Hines to recover under FELA, he must prove that his exposure to PCBs and other chemicals at work caused his bladder cancer and other injuries and that this causal relationship must be shown through expert testimony when it is beyond lay knowledge. Accordingly, Hines cannot prove causation unless Shubin's testimony is admissible which, Conrail contends, it should not be under the Federal Rules of Evidence.

For the reasons that we stated in *Paoli*, however, defendants' attempts to exclude Shubin's expert witness testimony in this case may not be warranted because the evidence that Shubin attempted to present here is identical, or directly comparable, to the evidence that he or others attempted to present in *Paoli*. Even more significant is the more lenient FELA standard for causation.

In addition, Shubin's intensive and personal investigation of Hines distinguishes Shubin's testimony from the testimony excluded by courts in a number of cases cited by Conrail where there was no evidence in the record that experts ever examined or tested the plaintiff (or assertions) at issue. *See, e.g., Pennsylvania Dental Assoc. v. Medical Serv. Assoc.*, 745 F.2d 248, 262 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985) (emphasizing that economist's assertions cited no support in the record); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1223, 1242–45 (E.D.N.Y.1985) (noting that experts who submitted affidavits never examined individual plaintiffs but instead based nearly all of their testimony on anecdotal information written by the plaintiffs and their attorneys), *aff'd on other grounds*, 818 F.2d 187 (2d Cir.1987), *cert. denied*, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988). Finally, one of the major cases cited by Conrail to support its contention that expert witness testimony concerning PCBs should be inadmissible has, since the time that Hines' and Conrail's original briefs were filed, been reversed on this very issue. *See Rubanick v. Witco Chem. Corp.*, 242 N.J.Super. 36, 576 A.2d 4 (App. Div.1990) *rev'g* 225 N.J.Super. 485, 542 A.2d 975 (Law Div.1988) (reversing trial court's decision to exclude expert testimo-

ny regarding an association between PCB exposure and colon cancer because trial court inappropriately concluded that expert lacked requisite education and training to testify and because expert offered a "novel scientific opinion" concerning causation).

## B. *Process*

A detailed factual record is required at the evidentiary stage, particularly when a summary judgment may result. *See DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 952 (1990); *Indian Coffee Corp. v. Proctor & Gamble Co.,* 752 F.2d 891, 894–95 (3d Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985); *Japanese Electronic,* 723 F.2d at 276–79. In *Paoli,* we concluded that the district court did not provide plaintiffs with an adequate opportunity to present and defend the issues for which they were ultimately denied relief, and thus build a sufficient factual record for review. For example, the district court failed to conduct an *in limine* hearing, it denied oral argument on the evidentiary issues and the summary judgment motion, and did not allow plaintiffs a sufficient opportunity to discover the positions presented by the defendants' expert witnesses. *Paoli,* 916 F.2d at 854.

> Of particular significance, is the plaintiffs' inability to contest the reasonableness of the data and techniques relied on by defendants' experts. Having no foreknowledge of the direction that the district court's opinion might take, the plaintiffs should have been given an opportunity to be heard on the critical issues before being effectively dispatched from court.... On this ground alone, the summary judgment would have to be set aside.

Id. at 854–55. Similar to *Paoli,* the district court in this case: 1) did not conduct an *in limine* hearing; 2) denied oral argument on Shubin's testimony and on defendants' summary judgment motion; and 3) did not provide Hines with the opportunity to conduct discovery on Conrail's expert and consequently the data and techniques that Conrail's expert used. Thus, as we stated in *Paoli,* "[o]n this ground alone, the summary judgment would have to be set aside." *Id.* at 855.

## VI. EVIDENCE REVIEWED UNDER FED.R.EVID. 702

### A. *Expert Qualifications Reviewed in* Paoli *and This Case*

■ In *Paoli,* the district court appeared to base most of its exclusions upon Fed.R. Evid. 703. *Id.* at 845–46. However, the district court also referred at times to Fed.R.Evid. 702, "either explicitly or implicitly," in two general ways: 1) by rejecting a given witness as being unqualified to provide expert testimony in a particular field, and 2) by rejecting an expert, regardless of level of qualification, because the expert's testimony was based upon an unreliable scientific technique. *Id.* at 855. Because similar kinds of references to Fed.R.Evid. 702 were made by Conrail in its briefs before this court, and because it is possible that the district court relied in this case on the same reasoning that it used in *Paoli,* we will examine Conrail's arguments in light of our conclusions in *Paoli.*

■ In order to testify as an expert under Fed.R.Evid. 702, a witness must be sufficiently qualified and expert testimony must be helpful to the fact finder by providing an adequate factual foundation. *Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110, 114 (3d Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987). Fed.R.Evid. 702 states as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Paoli,* the district court appeared to have excluded much of the testimony of three experts (Barsotti, Zahalsky, and Nisbet) because the court questioned their qualifications. *Paoli,* 916 F.2d at 855. In light of what we considered to be the "liberal Rule 702 qualification standard," however, we held that the district court abused its discretion in excluding portions of the witnesses' testimony "simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate." *Id.* at 856; *see also Habecker v. Copperloy Corp.,* 893

F.2d 49, 51–53 (3d Cir.1990) (citing evidence of the Third Circuit's "broad" and "liberal" standard of admitting expert testimony). The district court's exclusion was inconsistent with both the jurisprudence and language of Rule 702 which "make clear that various kinds of 'knowledge, skill, experience, training, or education'" make an expert qualified in a certain area. *Paoli*, 916 F.2d at 855 (*quoting* Fed.R.Evid. 702).

In this case, Conrail argued that Shubin was unqualified to be an expert. Although Shubin is a medical doctor, Conrail contended that he was not an expert, nor did he have publications, in a number of different disciplines that Conrail suggested were relevant to diagnosing Hines' condition. However, Shubin is a medical doctor with more than 50 years of experience in making differential diagnoses of patients and a pulmonologist with considerable training in treating individuals with occupational exposure. In *Paoli*, we found that Shubin's testimony was admissible under Fed.R. Evid. 702 and, for comparable reasons, Shubin's testimony should be reconsidered for admissibility in this case.

### B. Scientific Techniques Reviewed in Paoli and This Case

In *Paoli*, we stated that we could not review, and therefore could not affirm, defendants' critiques of the scientific data and techniques of most of the plaintiffs' experts (including Shubin) under Fed.R. Evid. 702 because defendants had not provided "adequate record development and fact finding" for an informed assessment. Consequently, we concluded that "to the extent that the summary judgment was based upon putative but unspoken exclusionary rulings, we must reverse and remand." *Paoli*, 916 F.2d at 859.

We find Conrail's critique of Shubin's scientific technique to be comparably inadequate. Therefore, as in *Paoli*, we will also reverse and remand on this issue. However, because in this case Conrail did discuss at somewhat greater length its rea-

sons for criticizing Shubin's scientific technique, we will examine briefly our discussion of this issue in both *Paoli* and *DeLuca*.

In *Paoli*, the district court excluded Nicholson's testimony based on meta-analysis[7] by applying Fed.R.Evid. 702 and the standard for analyzing novel scientific evidence set forth by this court in *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985). *Downing* provides a flexible, three-pronged, test for determining whether or not expert testimony that applies an allegedly unreliable technique or methodology is "unhelpful" and therefore inadmissible under Fed.R.Evid. 702. *DeLuca*, 911 F.2d at 954.

> Rule 702 requires that a district court ruling upon the admission of (novel) scientific evidence, i.e., evidence whose scientific fundaments are not suitable candidates for judicial notice, conduct a preliminary inquiry focusing on (1) the soundness and reliability of the process or technique used in generating the evidence; (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the proffered connection between the scientific research or test result to be presented, and particular disputed factual issues in the case.

*Downing*, 753 F.2d at 1237.

The *Paoli* defendants argued that Nicholson's use of the meta-analysis technique was too unreliable to be admitted by the court. Therefore, we accepted the district court's conclusion in *Paoli* that Nicholson's application of meta-analysis should be examined as a scientific technique under *Downing*. *Paoli*, 916 F.2d at 857.

In this case, Conrail's critique of Shubin's testimony under the *Downing* standard emphasized more the questionable reliability and trustworthiness of Shubin's evidence instead of what Conrail considered to be Shubin's "novel scientific opinion." According to our evidentiary analysis in

---

7. Meta-analysis involves pooling data from a number of different epidemiological studies (in order to enhance sample size) and comparing the results of these pooled data with the results produced by each study individually. By using

meta-analysis, Nicholson concluded that exposure to PCBs can cause certain disorders even though the results of no one study showed such an association. *Paoli*, 916 F.2d at 841.

*DeLuca,* it would be "unduly restrictive" to apply the *Downing* standard only to "novel" scientific evidence, although we note that wide-spread use of a particular methodology, or the fact that the methodology is generally accepted, is evidence that the methodology is "sound and reliable" within the meaning of the first prong of the *Downing* analysis. *Paoli,* 916 F.2d at 856 n. 34. Accordingly, *Downing* provides guidelines for determining whether scientific evidence is sufficiently trustworthy to be admitted when the "helpfulness" standard cannot be applied through judicial notice. *DeLuca,* 911 F.2d at 955 n. 13.

Therefore, we accept Conrail's more liberal use of the *Downing* standard. However, we cannot agree, without further information, that Shubin's testimony should be excluded because of it for the reasons that we cited in *Paoli.* Moreover, we cannot agree that the district court conducted a *Downing*-type evaluation of Shubin's testimony in this case simply because the court had the appropriate information (such as scientific affidavits and literature) before it. Conrail cannot assume, in the absence of an opinion in this case, that the district court would have excluded Shubin's testimony under Fed.R.Evid. 702 simply because the issue had now been raised.

Furthermore, we believe that Shubin used traditional methods to form his opinion by reviewing a variety of background factors that are normally investigated in the medical profession, including: Hines' histories of other exposures to toxins, drugs, and alcohol, the length of his residences, employment experience, PCB-related symptoms, blood tests, liver function tests, immunological tests, gas chromatograph tracings, a number of reports, as well as all of the scientific literature that indicates that PCBs can be associated with severe health problems, including cancer. Thus, even though Shubin's opinion could be considered to be "novel," it appears that, under the *Downing* standard, his methods were not.

## VII. EVIDENCE REVIEWED UNDER FED.R.EVID. 403

■ Even if expert testimony were held to be admissible under Fed.R.Evid. 702 and 703, Fed.R.Evid. 403 provides an independent means for excluding expert testimony. Fed.R.Evid. 403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

As we noted in *Paoli,* however, it was "not clear" that the district court "actually excluded any opinions under Rule 403" even though the district court suggested that it was "excluding all of the plaintiffs' expert opinion under Rule 703 and 403." *Paoli,* 916 F.2d at 859. Regardless, we emphasized that the district court failed to follow the balancing standard required by Rule 403 and this court's jurisprudence. *See, e.g., Downing,* 753 F.2d at 1243 (suggesting an *in limine* hearing for this purpose); *United States v. Long,* 574 F.2d 761, 770 (3d Cir.) (stating that the record should reflect some balancing standard), *cert. denied,* 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978).

Furthermore, excluding evidence under Fed.R.Evid. 403 at the pretrial stage is an extreme measure. "[A] court must have a record complete enough on the point at issue to be considered a virtual surrogate for a trial record." *Paoli,* 916 F.2d at 859–60. We held that the record in *Paoli* failed to meet such a standard and therefore reversed the district court's exclusion of evidence under Fed.R.Evid. 403. *Id.* at 860. For comparable reasons, we reverse the district court's exclusion of evidence under Fed.R.Evid. 403 in this case.

## VIII. SUMMARY JUDGMENT WAS NOT PROPERLY GRANTED

■ Because the district court in *Paoli* excluded nearly all of the plaintiffs' evidence concerning causation, we noted that the court could then easily conclude that plaintiffs' evidence was not sufficient to survive a summary judgment motion under the standard established in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the *Paoli* defendants also argued that a summary judgment would stand even if all the evidence were admitted because plaintiffs could not present a genuine issue of material fact with regard to the four required elements of a *prima facie* case on causation under Pennsylvania law. *Paoli*, 916 F.2d at 860.

As set forth by the district court in *Paoli*, these four elements are:

> 1) that defendants released PCBs into the environment; 2) that plaintiffs somehow ingested these PCBs into their bodies; 3) that plaintiffs have an injury; 4) that PCBs are the cause of that injury.

*Paoli*, 706 F.Supp. at 375. Although there was no dispute over the first element, the district court ruled against the plaintiffs on the last three elements. We concluded, however, that if the excluded evidence were admissible, a genuine issue of material fact would be created as well on the latter three elements. *Paoli*, 916 F.2d at 860.

Concerning the second element, exposure, we stated that there was conflicting evidence over what constitutes a normal "background" level of PCB exposure in the United States. Such conflict was sufficient enough to create a genuine issue of material fact if jurors could reasonably accept plaintiffs' background level data and therefore conclude that plaintiffs who lived closer to the railyard had a higher-than-normal PCB level. We concluded that there were also genuine issues of material fact with regard to the third element, injury, because most plaintiffs presented evidence of physical injury and those who did not alleged monetary injury under their medical monitoring claim, an issue that is not relevant in this case. The fourth element, causation, was the most contentious in *Paoli*. According to the *Paoli* defendants, plaintiffs did not provide any admissible toxicological or epidemiological studies demonstrating an association between PCBs and human injuries. *Id.* at 860–62. In light of the

evidence that had been presented in *Paoli*, however, we disagreed in a discussion that included a direct reference to Shubin.

Both Drs. Barsotti and Nicholson testified to a positive correlation between PCB exposure and human illness. Drs. Barsotti, Nicholson, Zahalsky, Shubin and DiGregoiro gave testimony, with reference to scientific studies, from which a jury could infer that there is a causal relationship between PCB exposure and various illnesses contracted by plaintiffs. *See DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941 (3d Cir.1990) The principles of *DeLuca* respecting statistical significance are also, of course, applicable to any studies relied on.

*Id.* at 862. Overall, then, we concluded that the *Paoli* plaintiffs could have survived a summary judgment motion on each of the four *prima facie* elements. *Id.*

Even though Hines brought suit under FELA, we find it useful to apply *Paoli*'s analysis for a tort action to the facts of this case as a means of comparison with *Paoli*. As in *Paoli*, Hines also submitted evidence that could have survived summary judgment on each of the four elements of a *prima facie* case. In contrast to the *Paoli* defendants, however, Conrail did dispute the first element concerning exposure, arguing that Hines "did not spend any significant amount of time at the Paoli Yard and offered no evidence of the presence of PCBs along any portion of the hundreds of miles of track that he worked." Letter Brief for Appellees (General Electric) at 2. Moreover, it contends that Hines must show that his exposure to PCBs was not merely "an incident of living in an industrial society in which the presence of PCBs in low concentrations in the body is a nearly universal condition." Letter Brief for Appellees (Conrail) at 3. However, we conclude that Shubin presented sufficient evidence to show that Hines could have been exposed to PCBs in the workplace and we conclude, as we did in *Paoli*, that this could be a genuine issue of material fact to be determined by the jury.

As in *Paoli*, Shubin's evidence also could have satisfied the second element, ingestion, with reports of Hines' PCB fat tissue level and with Hines' overall medical

evaluation. The fact that there is conflicting evidence regarding what the average blood level should be, or whether Hines exceeded that average, could once again be a question for the jury, not an issue for summary judgment. The third element, injury, is satisfied in this case because Conrail did not contest the substantial amount of medical evidence presented by Shubin demonstrating that Hines suffered from bladder cancer and various other medical problems. The fourth element regarding causation in this case could be satisfied by our holding in *Paoli* because we expressly included Shubin's name in our conclusion that plaintiffs' experts relied on scientific studies in their testimony which could suggest that a causal relationship existed between PCB exposure and plaintiffs' various illnesses. *Paoli*, 916 F.2d at 862. Our liberal standard of causation under FELA bolsters our conclusion that there could be sufficient evidence in this case to survive a summary judgment.

Conrail also argues that, in contrast to *Paoli*, Hines did not make a claim for medical monitoring and therefore the "decreased burden of proof apparently applied by the *Paoli* decision based on medical monitoring has no claim here." Letter Brief for Appellees (General Electric) at 3. However, in *Paoli*, we treated our decision regarding the medical monitoring claim, together with what we characterized to be other "discrete" or "distinct" legal issues, separate and apart from our decision regarding the admissibility of evidence under Fed.R.Evid. 702, 703, and 403. *Paoli*, 916 F.2d at 836, 861. Conrail is incorrect, then, in concluding that our decision on the medical monitoring issue in any way affected, either substantively or in terms of burden of proof, our decision regarding the admissibility of the testimony of other experts.

Overall, then, we believe that the district court essentially compared the expert testimony contributed by Hines and Conrail and inappropriately concluded that Conrail's testimony was more persuasive, regardless of the strong disagreement among experts. Moreover, we believe that if Shubin's testimony were to be admitted, it could be sufficient to survive a summary judgment motion. In light of this holding, then, we follow our conditional conclusion enunciated in *Paoli*. "[I]f, after further proceedings consistent with this opinion, the district court were to exclude enough of plaintiffs' expert's evidence on causation (or other critical issues) such that no genuine issue of material fact remained, it would be free to grant summary judgment for the defendants." *Id.* at 862; *see also Pehowic v. Erie Lackawanna R.R.*, 430 F.2d 697, 699–700 (3d Cir.1970) (stating that, in FELA cases, a summary judgment for defendants is justified "only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee").

## IX. CONCLUSION

We hold that Shubin's testimony was improperly excluded. Therefore, we will reverse the grant of summary judgment in Conrail's favor and remand this case to the district court for further proceedings consistent with this opinion.