32 F.3d 969
 40 Fed. R. Evid. Serv. 47, Prod.Liab.Rep. (CCH) P 13,997
Bryan J. GLASER, Individually; Charles Glaser and Margaret
Glaser, Individually; and Charles Glaser and Margaret
Glaser as Co-Guardians of Bryan J. Glaser, a legally
incapacitated person, Plaintiffs-Appellants,
v.
THOMPSON MEDICAL COMPANY, INC., Defendant-Appellee,
Blue Cross & Blue Shield of Michigan, intervening as a
silent plaintiff, Movant.
 No. 92-2432.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 2, 1993.
Decided Aug. 17, 1994.
Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 9, 1994.*
 
 Lee R. Franklin (argued and briefed), Lopatin, Miller, Freedman, Bluestone, Erlich & Rosen, Detroit, MI, for Bryan J. Glaser, Charles Glaser, Margaret Glaser.
 Jeffrey S. Lichtman, Skadden, Arps, Slate, Meagher & Flow, New York City, Kathleen A. Lang (briefed), John E. Scott (argued), Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for Thompson Medical Co., Inc.
 Before: MERRITT, Chief Judge; and NELSON and BOGGS, Circuit Judges.
 MERRITT, Chief Judge, delivered the opinion of the court, in which NELSON, Circuit Judge, joined.
 BOGGS, Circuit Judge (pp. 978-89), delivered a separate dissenting opinion.
 MERRITT, Chief Judge.
 
 
 1
 Plaintiffs appeal the district court's grant of summary judgment for the defendant on the single issue of causation in this product liability action. Plaintiffs allege negligence and breach of warranty in defendant-pharmaceutical company's manufacture and distribution of the diet pill "Dexatrim." Specifically, the complaint alleges that plaintiff Bryan Glaser's ingestion of one capsule of Dexatrim caused him to suffer acute hypertension which in turn caused him to suffer a stroke or intracranial bleed. That stroke caused him to fall, hit his head, and suffer further severe injuries. In granting defendant's motion for summary judgment on this single issue, the district court ruled that the evidence proffered by plaintiffs on causation was insufficient to go to the jury. The issue before us is essentially a factual one: Is the evidence offered below consisting primarily of the deposition testimony of plaintiffs' expert sufficient to create a dispute of material fact? We believe there is a genuine dispute of material fact regarding causation and therefore reverse. This holding carries no implications regarding the other facets of plaintiffs' claims of negligence and breach of warranty.
 
 I.
 
 2
 The evidence offered by plaintiff on summary judgment is as follows: Twenty year-old Bryan Glaser began daily ingestion of one or two extra-strength Dexatrim diet pills around Thanksgiving, 1987. On Sunday, January 3, 1988, Bryan complained that he felt ill: his ears were ringing, and he experienced hot and cold flashes and other flu-like symptoms. He cancelled plans for that evening in order to rest. Early the next morning while Bryan was still asleep, Bryan's sister Jodi noticed an unopened foil package containing one capsule of Dexatrim on Bryan's dresser in his bedroom along with a glass of water and other vitamin pills. Although no one ever observed Bryan ingest the capsule, Jodi testified that the package had been opened and the capsule and other vitamins were no longer on the dresser later that morning. Bryan left home around noon on Monday and went to the Medstop walk-in medical clinic. Medical records indicate that he complained of hot and cold flashes, ringing in his ears and fatigue. His blood pressure was within normal range (128/82) and the treating physician, Dr. Baubie, diagnosed Bryan with post-viral syndrome and fatigue. Dr. Baubie did not know that Bryan was taking Dexatrim.
 
 
 3
 After leaving the clinic, Bryan went to the bank, where he stood in line for approximately 20 minutes before reaching teller Jaqueline Kulchycki's window. Kulchycki's testimony is important. She testified that it was obvious to her that Bryan was not feeling well: he was squinting, holding his head as if he had a severe headache, and was flushed and sweating. As she turned away from her station, Bryan collapsed to the floor and hit his head. Emergency medical personnel were called and they transported Bryan to Detroit Macomb Hospital for treatment. He was diagnosed with an intracerebral bleed on the left frontal lobe of his brain, a skull fracture and a subdural hematoma. Emergency room doctors never attempted to diagnose the cause of his fall, but rather assumed that all of his injuries resulted from the fall.
 
 
 4
 The plaintiffs filed this lawsuit asserting that the fall was caused by the intracranial bleed found on the left frontal lobe of Bryan's brain, and that this bleed had been caused by ingestion of Dexatrim. After extensive discovery, the defendant filed motions for summary judgment, arguing that the scientific literature did not support a conclusion that one capsule of Dexatrim could cause an acute hypertensive reaction, that there was no evidence that an intracranial bleed preceded the fall, and that there was no evidence that Dexatrim caused such a reaction in Bryan. The district court assumed in its opinion that the scientific evidence was sufficient to support the conclusion that one capsule of Dexatrim can cause an acute hypertensive reaction serious enough to induce intracranial bleeding. The district court held, however, that the opinion of Dr. Zaloga, plaintiff's medical expert, was merely consistent with the known facts and conditions of the case, but was not based on a logical sequence of cause and effect. On that basis, the court granted summary judgment in favor of the defendants.
 
 II.
 
 5
 Our review of a district court's grant of summary judgment is de novo. All facts must be viewed and inferences drawn in favor of the plaintiffs. Summary judgment is proper only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 6
 The burden of proof in establishing proximate cause lies with the plaintiff. Plaintiff must introduce evidence which provides a reasonable basis upon which a jury could conclude that it was more likely than not that the defendant's conduct in fact caused the injury. "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced," the plaintiff has not met the burden. Mulholland v. DEC Int'l Corp., 432 Mich. 395, 443 N.W.2d 340, 350 n. 18 (1989) (quotations omitted). Sitting in diversity, we apply Michigan's law of causation. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
 
 
 7
 The propriety of summary judgment in this case hinges on three causation questions:
 
 
 8
 1. Whether one capsule of Dexatrim is capable of causing hypertension severe enough to cause an intracranial bleed.
 
 
 9
 2. Whether Bryan suffered the intracranial bleed on the left frontal lobe of his brain prior to his fall.
 
 
 10
 3. Whether the bleed was caused by ingestion of Dexatrim.
 
 
 11
 Summary judgment is proper if there are no material issues of fact regarding any of these questions, and if any one of them should be answered in favor of the defendant. We address these questions in turn.
 
 A.
 
 12
 The defendant first challenges the scientific basis for Dr. Zaloga's conclusion that Dexatrim can cause severe hypertension. It argues that the medical studies proffered by the plaintiffs as support for Zaloga's conclusions actually support the defendant's position that Dexatrim cannot cause significant elevations in blood pressure and further that because there is no basis for the expert's opinion, the court should not allow a jury to decide the causation issue.
 
 
 13
 The testimony of plaintiff's expert is admissible. The Supreme Court, in Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), set forth the standard for admission of expert scientific testimony, holding that Rule 702 of the Federal Rules of Evidence governs the admissibility of such expert testimony. Rule 702 admits expert testimony if the evidence will assist the trier of fact and if the witness is qualified as an expert. The Rule provides:
 
 
 14
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 15
 Daubert explained that Rule 702 must be read in the context of the liberal thrust of the Federal Rules of Evidence and must be interpreted consistently with the "general approach of relaxing the traditional barriers to 'opinion' testimony." Daubert, --- U.S. at ----, 113 S.Ct. at 2794 (quotations omitted). The Court also cautioned in its opinion that even under these liberal requirements, trial judges must ensure that scientific testimony is not only relevant, but reliable. Id. at ----, 113 S.Ct. at 2795. A court must determine:
 
 
 16
 whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
 
 
 17
 Id. at ----, 113 S.Ct. at 2796 (footnote omitted).
 
 
 18
 In assessing scientific validity, the Court provided a non-exclusive list of factors to assist the trial courts: (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation, and (4) whether the theory or technique has been generally accepted in the particular scientific field. United States v. Bonds, 12 F.3d 540, 555 (6th Cir.1993) (citing Daubert, --- U.S. at ----, 113 S.Ct. at 2796-97). The inquiry must be a flexible one whose "overarching subject is the scientific validity--and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission." Daubert, --- U.S. at ----, 113 S.Ct. at 2797.
 
 
 19
 If a court concludes that the evidence supporting the expert's position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, then the court remains free to prohibit the case from proceeding to the jury. Id. at ----, 113 S.Ct. at 2798 (citing Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349 (6th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992)). "[A]lthough judges should respect scientific opinion and recognize their own limited scientific knowledge, nevertheless courts have a duty to inspect the reasoning of qualified scientific experts to determine whether a case should go to a jury." Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349 (6th Cir.1992) (calling for a "hard look" by courts at the basis of scientific opinion); see also Cantrell v. GAF Corporation, 999 F.2d 1007, 1013-14 (6th Cir.1993).
 
 
 20
 A thorough review of all of the literature submitted by both parties and of Dr. Zaloga's testimony convinces us that sufficient, valid, peer-reviewed scientific evidence, along with Dr. Zaloga's own clinical and research experience, provide a solid foundation upon which Dr. Zaloga bases his conclusion that the 75 milligrams of phenylpropanolamine (PPA), the active ingredient in one capsule of Dexatrim, caused acute hypertension. Dr. Zaloga testified during his deposition that his opinion was based on the five studies he published on the topic, the published articles of other medical researchers, case reports, his experience treating patients who had ingested PPA-containing compounds, his clinical experience with PPA in other studies, and his experience directing endocrine and obesity clinics. (Zaloga's Deposition Tr. at 26-28).[1]
 
 
 21
 The medical literature upon which Dr. Zaloga relies includes five studies which he co-authored and two other published research papers on the subject of PPA's effect on blood pressure. The first paper, published in September 1988,[2] studied the effects of double doses of PPA (150 mg) and of 75 mg of PPA with 400 mg of caffeine. The results showed that 75 mg alone did not cause clinically relevant hypertension in the six subjects tested, but did show clinically relevant hypertension in the subjects taking 150 mg and the 75 mg with caffeine. The authors noted that at least 15 North American cases of hemorrhagic stroke and hypertensive crisis had been attributed to PPA in doses equal or less than 150 mg.
 
 
 22
 In Dr. Zaloga's second paper,[3] the authors studied the effects of single doses of PPA on blood pressure after 1 and 2 hours, and after 2 weeks. The study found no clinically significant rises in blood pressure during these time periods but noted that more significant rises at other times may have been missed. The authors called for further studies in light of the numerous reports of severe adverse reactions to PPA.
 
 
 23
 Dr. Zaloga's third paper[4] was a follow-up study based on the reports of severe adverse reactions following ingestion of single (75 mg) or double doses of PPA with or without caffeine. The results of this study indicated that single doses of PPA may significantly elevate blood pressure, usually at approximately 3 to 4 hours after ingestion.[5] The authors concluded that their findings "may explain some of the recent case reports of nontraumatic intracranial hemorrhage in young, healthy persons ingesting PPA at recommended or minimally greater dosages." Specifically, the subjects taking only 75 mg of PPA showed significantly higher blood pressures than those on placebo, and three subjects had systolic blood pressure readings of 160 mm Hg or higher. The paper also noted that strokes caused by PPA had been established in animal studies and that a literature review of 140 cases of adverse reactions to PPA included intracerebral hemorrhages and major motor seizures. It hypothesized that several cases of strokes in young, healthy individuals were attributable to PPA based on severe, transient and unrecorded hypertensive episodes, and asserted that this hypothesis is supported by recorded episodes of such reactions.
 
 
 24
 The fourth paper co-authored by Dr. Zaloga[6] examined the pharmacokinetic interaction of PPA and caffeine, concluding that physical side effects as well as increases in both systolic and diastolic blood pressure occurred after ingestion of the combination of 400 mg of caffeine and 75 mg of PPA; and that these effects were more severe after ingestion of the combination of PPA and caffeine than when either drug was ingested alone. The main result of the study was that PPA may enhance absorption or inhibit elimination of caffeine from the body, and may explain increased side effects reported after their combined use.
 
 
 25
 The fifth paper co-authored by Dr. Zaloga[7] studied the effects of 75 mg of PPA, 75 mg PPA with 400 mg caffeine, and 150 mg PPA on blood pressure. It found that blood pressure increases correlated with PPA plasma levels and that all three subject groups experienced three times more blood pressure rises than did the placebo group. The authors called for further studies of the blood pressure effects of 75 mg PPA, explaining that some individual peak blood pressures that were reached were worrisome, including systolic pressure of 210 and diastolic pressure of 160 mg Hg. The authors state:
 
 
 26
 Although our data agree with others that a recommended dose does not consistently raise blood pressure to clinically important levels in quietly resting, young, healthy subjects, as many as 20% of one study population (2 of 10 subjects in the Pentel study) demonstrated some blood pressure supersensitivity to recommended doses of [PPA].... The frequent use of [PPA], its wide availability over-the-counter in drug and many grocery stores, the potential for overuse of such non-prescription drugs and finally, the growing body of anecdotal case reports implicating [PPA] in severe adverse reactions give cause for concern.
 
 
 27
 Id.
 
 
 28
 Zaloga also relies on at least two other studies to support his conclusion. Pentel[8] studied the efficacy and safety of propanolol as a drug to counter PPA-induced hypertension. The study found that PPA increased blood pressure in a dose-related fashion with blood pressure rising significantly in some individuals after 75 mg doses. The greatest individual rise in blood pressure after 75 mg PPA was 55 mg Hg systolic and 35 mm Hg diastolic.[9]
 
 
 29
 Finally, Zaloga relies to a lesser extent on the Horowitz paper. It summarizes a study done on the effects of single doses of PPA-containing compounds. Subjects receiving 85 mg PPA suffered increases in blood pressure with that pressure rise peaking between 1.5 and 3 hours after ingestion. The authors concluded that the frequency and extent of hypertensive responses to PPA suggest that clinical use of such preparations should be reviewed. The authors state that potentially dangerous rises in blood pressure may occur after ingestion of a single capsule of PPA-containing substances and that a report of cerebral hemorrhage after ingestion of 85 mg confirms that these adverse effects may be life-threatening.[10]
 
 
 30
 These studies, together with Dr. Zaloga's extensive experience and work in this area, provide sufficient, reliable scientific data upon which Dr. Zaloga may base his conclusion. All of these papers have clearly explained, solid scientific methodologies upon which they have tested their theories, and all have been peer-reviewed and published in reputable medical journals, including The American Journal of Medicine, the Lancet, The Journal of Clinical Pharmacology, and Neuropsychopharmacology. The error rates are published and their impact on the studies explained. These factors, as outlined in Daubert and Bonds, indicate the reliability of the foundation upon which Dr. Zaloga rests his opinion.
 
 
 31
 Finally, Dr. Zaloga and the plaintiffs concede readily that there are other studies that disagree with Dr. Zaloga's conclusion. Dr. Zaloga distinguishes many of them and points to flaws in their methods and data reporting techniques which led him to rely on the above-outlined works in reaching his conclusions.[11] Such differences in opinions among medical experts do not invalidate Dr. Zaloga's opinion, but rather create material issues of fact which must be resolved by the jury.
 
 
 32
 Our mode of analysis here follows Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349 (6th Cir.1992). There we analyzed closely a large number of epidemiological, in vitro and animal studies and concluded that scientific opinion would not support a finding by the jury that the drug in question "more probably than not caused the birth defects" at issue. Id. at 1360. We concluded that the one expert for the plaintiff who testified that the drug did cause the injury had based his testimony on "personal belief or opinion," not "on the basis of the collective view of his scientific discipline," nor by explaining coherently the "grounds for his differences" with his scientific peers. Id. We therefore concluded that the expert's conclusions "go far beyond the known facts that form the premise for the conclusion stated." Id. After a close examination of the basis for Dr. Zaloga's testimony, we have reached a contrary conclusion for the reasons previously stated. In sum, we believe that sufficient, reliable evidence exists upon which Dr. Zaloga may testify that one capsule of Dexatrim (75 mg PPA) is capable of causing acute hypertension. Such testimony creates material issues of fact and precludes summary judgment on the question.
 
 B.
 
 33
 The next causation question raised is whether Bryan's intracranial bleed occurred prior to his fall or whether the fall instituted the bleed. Dr. Zaloga's medical opinion is that the bleed preceded, and thereby caused, the fall. This opinion is based on two distinct determinations: (1) that nothing other than the bleed was likely to cause the fall, and (2) that it is unlikely that the fall caused the bleed. This testimony, as explained in more detail below, is sufficient to create a material question of fact for the jury as to whether the left frontal lobe bleed that Bryan suffered preceded (and caused) Bryan's fall, or whether the fall preceded the bleed.
 
 
 34
 Dr. Zaloga explained that Bryan's symptoms prior to the fall were typical of a patient with a slow-leaking vessel within the brain. He stated that although a viral entity (the flu) would be capable of causing a patient to faint, Bryan was not suffering from other typical flu-like symptoms such as upper respiratory problems, a runny nose, a cough or sore throat. Further, Dr. Zaloga noted that there was no evidence that Bryan slipped and fell and no medical evidence of severe dehydration or other condition such as a seizure disorder, leukemia or a platelet problem that might have left Bryan predisposed to such a fall.[12]
 
 
 35
 Dr. Zaloga conceded in his deposition that the left frontal lobe bleed might have started after the fall. He explained that it would be possible that Bryan's head hitting the floor might have caused movement throughout the brain, tearing the blood vessels in the left frontal lobe. However, since the back of Bryan's head hit the floor on the right side, Dr. Zaloga stated that he would not expect to see bleeding in the left frontal lobe but no injury to the right frontal lobe. Rather, he would expect to see a more deep-seated, pure deep bleed, or at least bruising on the surface of the right frontal lobe or multiple bruising throughout the brain.[13] Based on his experience as a practicing physician who has treated over one thousand patients with intracranial damage and who has daily contact with patients with neurological problems, Dr. Zaloga stated that in his opinion the probabilities were much greater that the bleed preceded the fall than vice versa.[14]
 
 
 36
 This testimony clearly creates material questions of fact for the jury. Dr. Zaloga is a well-qualified medical expert in this area. His deposition makes clear that he carefully applied his medical knowledge and experience to the facts of this case in order to render his opinion. That opinion would assist a jury in determining whether Bryan suffered the bleed of the left frontal lobe prior to the fall and thereby determine whether the bleed could have caused the fall and further injury.
 
 C.
 
 37
 Given that there is sufficient evidence to allow a jury to conclude that the left frontal bleed preceded the fall, we must still determine if questions of material fact exist to allow a jury to decide that Dexatrim, rather than some other agent, caused the bleed. We find that there are material questions of fact created by Dr. Zaloga's testimony on this point.
 
 
 38
 Dr. Zaloga testified that in his opinion the most likely cause of the bleed on the left frontal lobe of Bryan's brain was a bleed related to hypertension, induced by the use of Dexatrim. Relying on the process of differential diagnosis,[15] Dr. Zaloga ranked five possible causes for a bleed such as Bryan's: First, a severe underlying central nervous system disease. Dr. Zaloga ruled this out as a cause of Bryan's bleed since there was no medical evidence, past or present, that Bryan suffered from such a condition. (Depo.Tr. at 65). Second, Dr. Zaloga testified that he looked for a past history of severe hypertension. He again ruled this out as a cause since Bryan's past medical records indicated he was "normotensive." (Depo.Tr. at 66). Third, Dr. Zaloga looked for an undiagnosed underlying disease of the brain such as an aneurysm or a tumor. He testified that the arteriogram and CT scan done on Bryan after the injury showed no evidence of such a condition. (Depo.Tr. at 67-8).
 
 
 39
 Fourth, Dr. Zaloga testified that he looked for a drug that could cause acute hypertension. He explained that frequently physicians find use of cocaine or other amphetamines capable of influencing blood pressure in this manner. He stated that PPA falls within this class of drugs. He stated that the evidence he had been given showed that Bryan was using Dexatrim, was not using other drugs of this type, and that Bryan's symptoms prior to the fall and subsequent medical tests were consistent with a drug-induced bleed.[16]
 
 
 40
 Dr. Zaloga also testified that he ranked spontaneous intercerebral bleeds and a bleed occurring secondary to the fall below drug-related bleeds in his differential diagnosis. He stated that if he were to compare in probabilities the likelihood of these causes with a drug-related cause, his opinion was that it was 80% likely that the bleed was caused by Dexatrim; 15% likely it was related to the fall; and 5% likely that it was related to other undiagnosed conditions. (Depo.Tr. at 209-10). He explained that his opinion was based on evidence which showed that Bryan's symptoms and clinical state were consistent with a leaking vessel in the brain, that the timing of the injury was consistent with the pharmacokinetics and physiological effects of the drug,[17] that no other evidence showed that he had slipped and fallen, and that there was no other medical evidence to explain the fall or fainting.
 
 
 41
 We recognize that assigning numerical percentages to an event such as this is inherently difficult. Such figures are educated, reasoned estimates; they cannot be calculated and therefore cannot be argued to be exact.[18] However, Dr. Zaloga arrived at these probabilities and his opinion by employing differential diagnosis, a standard diagnostic tool used by medical professionals to diagnose the most likely cause or causes of illness, injury and disease. See Hines v. Consolidated Rail Corp., 926 F.2d 262, 270 n. 6 (3d Cir.1991); Parsons v. Heckler, 739 F.2d 1334, 1337 n. 5 (8th Cir.1984). Dr. Zaloga clearly explained his use of and reasoning under the technique and related the probabilities he estimated to all the facts and circumstances surrounding this incident, including Dexatrim's ability to cause such incidents, the amount Bryan was assumed to have ingested, Bryan's symptoms prior to his injuries, and medical evidence for ruling out other potential causes of the bleed.[19] We therefore do not find the probability estimates without "logical basis," as the defendant contends.
 
 
 42
 Dr. Zaloga's opinion is backed by medical evidence and explanation and creates material questions of fact as to whether Bryan's intracerebral bleed was caused by his ingestion of Dexatrim.[20]
 
 
 43
 We therefore REVERSE the district court's grant of summary judgment in favor of the defendant and REMAND the case for further proceedings.
 
 
 44
 BOGGS, Circuit Judge, dissenting.
 
 
 45
 The fundamental issue in this case is whether there is sufficient scientific and medical evidence for a jury to determine that Bryan Glaser's brain injury, which was discovered after, and certainly resulted at least in part from, a fall, was proximately caused by his ingestion of a standard 75-milligram dose of Dexatrim, an over-the-counter diet pill. For the reasons given below, the evidence in support of that proposition is almost wholly speculative, and cannot justify submission of the issue to a jury.I
 
 
 46
 This case represents a somewhat typical example of a broad category of tort litigation. The plaintiff engages in an allegedly causative act. In this case it is the taking of a non-prescription diet pill, with an active ingredient that Americans consume in the same dosage billions of times every year. The resultant event, which undoubtedly occurred, is a fall leading to the striking of plaintiff's head on the floor of the bank in which he was standing. Thus, we have an alleged cause, which is experienced annually by tens of millions of people. We have an alleged effect, a fall, which is also suffered by many, many people. The difficult question is what connects these two events, other than post hoc propter hoc. Also, as in most tort cases of this type, when there is little or no obvious cause and effect relationship, there is an expert witness on whom the plaintiff relies to present the case to the jury.
 
 
 47
 * In this case, Dr. Zaloga is generally qualified as an expert in endocrinology, and has carried out, or been involved in, or reviewed scientific literature concerning, studies on the relationship between phenylpropanolamine (PPA), the active ingredient in Dexatrim; elevated blood pressure; and intracranial bleeding. The problem, however, is that Dr. Zaloga wishes to extrapolate from areas in which studies have shown some causative tendency into areas where the scientific data have in fact been negative or, at most, purely speculative. For example, some correlation, implying causation to some, has been shown when subjects take 150 mg of PPA, which is twice the dose that plaintiff is posited to have taken. Alternatively, some effect has been shown when subjects take 75 mg of PPA in connection with 400 mg of caffeine, an amount of caffeine equal to several cups of coffee or many cola drinks.[1] Despite loose language in Zaloga's deposition, which has been faithfully mined by the court's opinion, the record contains neither well-documented clinical cases nor experimental studies showing a connection between 75 mg of PPA taken alone, and blood pressure high enough to result in intracranial bleeding and a stroke.
 
 
 48
 Second, it is important to note that the alternative and obvious explanation, that Bryan Glaser fainted and subsequently injured his head during the fall, is amply supported by the record. He had been dieting aggressively, had not been feeling well, had exhibited flu-like symptoms, had been examined and diagnosed with "post-viral syndrome" the very morning of his fall, and had been standing in a bank line for up to 25 minutes while wearing a coat inside a crowded, hot, and stuffy room just prior to his falling. Dr. Sharon, who later visited Glaser at the hospital at Bryan's family's request, explained the logic behind the assumption that Glaser suffered from "a viral syndrome and simply passed out ... because of prolonged standing in a line motionless while sick":
 
 
 49
 A number of reasons could produce that: inflammation of his semi-circular canals causing vertigo, dehydration from the illness itself, whether it's intestinal or just heavy breathing causing fluid loss from the lungs. Just no one--many times no one knows why you're dizzy when the virus is in you.
 
 
 50
 J.A. at 442.
 
 
 51
 It is also important to note that Dr. Zaloga never examined the plaintiff, neither before nor after he fell; that the plaintiff was examined by Dr. Baubie of MedStop shortly before he fell, and his blood pressure was found to be within the normal range; and that Dr. Bodzin, the emergency room physician at Detroit Macomb Hospital who first examined Glaser subsequent to the fall, attributed the bleeding in his brain to the trauma of the fall, not to a pre-existing intracranial bleed. J.A. at 199.B
 
 
 52
 Under Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and our court's opinion in Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349 (6th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992), a trial court is not required to allow a jury to pass on every case where a person with adequate general credentials can be found to utter some version of the talismanic phrase: "In my opinion it is more likely than not (or 80% probable) that X was caused by Y." Rather, such testimony must be supported by a reasonable chain of evidence, not speculation, and it is subject to the scrutiny of the trial court. Daubert, --- U.S. at ---- - ----, 113 S.Ct. at 2798-99 (confirming that trial judges must play a "gatekeeping role" and should grant summary judgment when the "scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true"); Turpin, 959 F.2d at 1352, 1359-60 (endorsing the "hard look doctrine").
 
 
 53
 "[A]lthough judges should respect scientific opinion and recognize their own limited scientific knowledge, nevertheless courts have a duty to inspect the reasoning of qualified scientific experts to determine whether a case should go to the jury." Turpin, 959 F.2d at 1350. As a general principle, courts look to medical experts to offer insights into medical "probabilities," not mere "possibilities." Tabaczynski v. United States, 529 F.Supp. 156, 163 (E.D.Mich.1981), aff'd mem., 711 F.2d 1059 (6th Cir.1983).
 
 
 54
 The plaintiff in a pharmaceutical product-liability action needs to establish that the drug under attack "more probably than not caused" the injury. Turpin, 959 F.2d at 1359. Thus, if the probabilities are "at best evenly balanced," Michigan law still directs a verdict for the defendant. Mulholland v. DEC Int'l Corp., 432 Mich. 395, 416 n. 18, 443 N.W.2d 340, 350 n. 18 (1989) (citation omitted). It does not suffice to produce evidence that the drug "is 'capable of causing,' 'could cause' or its effects are 'consistent with causing' " the injury. Turpin, 959 F.2d at 1360. Rather, the plaintiff must show that "it probably causes [that kind of injury] in general or that it did in this case." Ibid. Thus, a verdict for a plaintiff who claimed that she had contracted rheumatoid arthritis from swine-flu vaccine was overturned by this court because the plaintiff had only shown that "an antibody antigen reaction can cause rheumatoid arthritis, [but there was] no showing that it did cause the plaintiff's disease in this case." Hasler v. United States, 718 F.2d 202, 205 (6th Cir.1983) (emphasis added), cert. denied, 469 U.S. 817, 105 S.Ct. 84, 83 L.Ed.2d 31 (1984). This threshold is not met when a medical expert testifies to mere personal belief or opinion.
 
 
 55
 We believe that close judicial analysis of such technical and specialized matter is necessary not only because of the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony.[2] Although there is no suggestion of unethical scientific conduct in the present case, the potential for exaggeration and fraud on the court is present and may be impossible to discover without close inspection and careful consideration of the record. As Judge Leventhal observed in the context of administrative law, in some circumstances there exists a "combination of danger signals" requiring enhanced "judicial vigilance to enforce the Rule of Law." In such situations, "a court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to evidence on technical and specialized matters...."
 
 
 56
 Id. at 1352-53 (citations omitted).
 
 C
 
 57
 In this case, under the rubric of "differential diagnosis," Dr. Zaloga gave learned disquisitions as to why it was implausible that certain arcane conditions, such as major nervous systemic damage, genetic defects, or etiopathic bleeding, might possibly have caused the fall. He ruled out the possibility that Glaser's fall was caused by untreated hypertension, cocaine use, a tumor, an aneurism, leukemia, hemophilia, and Von Willerbrand's disease. However, with regard to the obvious possibility that Glaser simply fainted after standing in a stagnant bank line for as long as twenty-five minutes while wearing a coat inside a crowded, hot, and stuffy room, a short time after going to a doctor complaining of flu-like conditions, and during a period when he was dieting aggressively and eating improperly, Dr. Zaloga lightly brushed aside the plausibility of such an explanation with the extremely conclusory statement that "I don't have any evidence presented to me that suggests that he slipped or he fell. He wasn't in line for a prolonged period of time to have le[ ]d to pooling. We have no evidence that he was severely dehydrated or other reason to have fallen." J.A. at 365. Another portion of his testimony is further revealing:
 
 
 58
 THE WITNESS: I believe the teller testified--again, this is to my recollection--that she saw him sweating and thought it was unusual enough--different from anyone else--and did grab his head and looked somewhat out of it.
 
 
 59
 Q. (Mr. Lichtman) Do you know how hot it was in the bank?
 
 
 60
 A. No.
 
 
 61
 Q. Do you know whether or not it was warmer than it otherwise might have been in the bank?
 
 
 62
 A. I'm presuming that it--this is January 4th, 1988, and that it wasn't that hot. I mean, I'm--I'm just guessing on the time of the year. I'm also guessing that people--I believe there--there are descriptions of coats. I can't recollect that that's true or not.
 
 
 63
 And the teller described him as looking much different than the other people. So I--I don't know the exact answer to the question, but it would be hard for me to believe that it was so overly hot that he would be the only one to experience symptoms and no one else would be--at least by the teller's description.
 
 
 64
 But I don't know the specific answer to how hot it was in the bank.
 
 
 65
 Depo.Tr. at 128-29 (emphasis added). Thus, Dr. Zaloga discounted a teller's eyewitness account and personal recollection of conditions in the bank, all contained in a vivid description that he had read within the month.[3] Later, when asked again concerning the facts pertinent to this case, Dr. Zaloga responded:
 
 
 66
 Q. Now, if you consider that a person is wearing an overcoat in an inside of a bank that is warm and is waiting about 20, 25 minutes, standing up, on line, has already seen a doctor for fatigue that day, has told the doctor that they have not been feeling well, the doctor diagnoses the person as having a post-viral syndrome, and there is evidence that the person has not been eating a lot and--or potentially fasting that day, do you believe that that could lead to someone fainting?
 
 
 67
 ....
 
 
 68
 THE WITNESS: My--I think it's possible, but very unlikely. We have people like that all the time....
 
 
 69
 Depo.Tr. at 182-83.
 
 
 70
 Instead, without explaining how he arrived at such numbers, he simply assigned a "probability" of 80% to PPA ingestion as the cause of the fall and 15% to the fall being caused by fainting.[4] J.A. at 402-03. Probability is a legal term of art. It should be based on scientific method, not on personal opinion. See, e.g., Turpin, 959 F.2d at 1359-60. Nowhere does Zaloga's testimony explain where the numbers "80" and "15" come from. On the contrary, the numbers become fuzzier with the passage of a day's testimony:
 
 
 71
 So my opinion is that, in my mind, I would put the most likely cause for this injury to have been an intercerebral bleed which caused the fall, rather than some other event. I'm still leaving there, you know--I said before-- maybe an 80 percent probability of that sequence.
 
 
 72
 And I'm leaving two other diagnoses, as I said yesterday, that it's possible that he had the fall and then bled, and I--I have put a 15 percent on that, I believe, and a five percent for other etiopathic unknown causes.
 
 
 73
 Depo.Tr. at 300 (emphasis added). The court rejected such testimony in Turpin, where a medical witness testified with similarly unsupported imprecision, and this court stated that "[w]e cannot find ... that this testimony is anything more than a personal belief or opinion.... Indeed, no understandable scientific basis is stated. Personal opinion, not science, is testifying here." 959 F.2d at 1360.
 
 D
 
 74
 Dr. Zaloga prefaced his assignment of percentages with comments based on his general belief that even 75 mg of PPA can cause clinical damage from hypertension.[5] However, the cases in the medical literature to which Zaloga cites involve instances in which subjects were administered either 150 mg of PPA, or a combination of 75 mg of PPA with very substantial doses of caffeine. In the studies cited, no clinically significant effect was found, despite the very small number of subjects studied, in groups taking 75 mg alone.
 
 
 75
 The fallacy of the court's conclusion may be underscored by the implication that follows. Every day, many Americans faint and fall. By Dr. Zaloga's analysis, every one of them can get to a jury if they happen to have taken any of the 125-plus over-the-counter common-cold remedies or diet aids that provide doses of 75 mg of PPA (that is, not just Dexatrim, but also such medications as Contac and Dimetapp) and have no other strong organic reason for a faint.
 
 
 76
 The only caveat to this sweeping result would be Dr. Zaloga's statements that (1) Glaser was a healthy person who did not have flu symptoms (despite Dr. Baubie's diagnosis at MedStop, and Dr. Zaloga's own positing later that, as an alternative explanation to his preferred one, perhaps Glaser "did have a viral type syndrome ... some type of fatigue syndrome that led him to be weak and he fell based on that," Depo.Tr. at 206); and that (2) the pattern of brain damage did not seem to him to be consistent with damage from a fall (though it did seem so to Dr. Bodzin, the emergency room physician who first treated Glaser after the incident).[6]
 
 
 77
 However, Zaloga did not examine Glaser at any time, and the court does not indicate whether these two considerations are crucial, or whether the studies on PPA alone would have "carried the day." Moreover, the court does not indicate whether it considers Zaloga's type of long-distance diagnosis (clearly influenced heavily by the fact that Zaloga deeply believes that PPA can cause strokes in many consumers) to be an adequate basis for the crucial point that flu and other conditions did not cause the fall and the bleed.
 
 
 78
 In short, all that we have is a witness's personal belief that an environmental condition to which tens of millions are exposed annually is capable of wreaking random havoc. This belief is not supported by the scientific studies he refers to. Nevertheless, he believes and is willing to testify that an adverse effect following the condition is caused by the condition, and he minimizes very obvious alternative explanations.
 
 
 79
 This is post hoc propter hoc reasoning at its rankest, and is contrary to the "hard look" encouraged and even required by our case law. See, e.g., Turpin, 959 F.2d at 1352. The trial judge in this case did exactly what he should have done in his "gatekeeping role" by taking such a hard look. His actions warrant praise, not reversal.II
 
 
 80
 The court's analysis of the evidence for its first proposition, that 75 mg of PPA is capable of causing hypertension severe enough to result in an intercranial bleed, can be divided into three parts: (1) the Zaloga/Lake studies; (2) the Horowitz and Pentel studies; and (3) the adverse case reports.
 
 
 81
 These materials must be considered against the background of the significant studies, on large samples, introduced by the defense. Dr. Blackburn conducted a study with over 800 subjects. George L. Blackburn, et al., "Determinants of the Pressor Effect of Phenylpropanolamine in Healthy Subjects," 261 JAMA 3267 (1989), reprinted in J.A. at 310. Dr. Noble studied nearly 300 subjects. Rudolf Noble, "A Controlled Clinical Trial of the Cardiovascular and Psychological Effects of Phenylpropanolamine and Caffeine," 22 Drug Intelligence & Clinical Pharmacy 296 (1988), reprinted in J.A. at 316. Dr. Liebson studied 150 subjects. Ira Liebson, "Phenylpropanolamine: Effects on Subjective and Cardiovascular Variables at Recommended Over-the-Counter Dose Levels," 27 J. Clinical Pharmacology 685 (1987), reprinted in J.A. at 321. These studies showed statistically reliable but clinically insignificant increases in blood pressure with just 75 mg of PPA.
 
 
 82
 For example, Blackburn showed average blood pressure increases of 2-4 mm Hg with 75 mg of PPA, as opposed to a placebo. These findings were regarded as clinically insignificant. J.A. at 311, 313. Although he would like to see more individual data, Zaloga himself recognizes the Blackburn study as "a large-scale study, I think it's a reasonably good study." Depo.Tr. at 495. Some studies showed virtually no statistical effect at all from PPA. See Noble, J.A. at 316-18; Liebson, Table I, J.A. at 325. Zaloga recognizes both of these studies in terms similar to his description of the Blackburn study. Depo.Tr. at 502, 504. Despite the court's citation of Zaloga's critique that these studies report their results only in terms of mean and do not provide variances or ranges, the studies cited in this paragraph report findings just as do the Zaloga/Lake studies, reporting mean, variance, and statistical significance. See, e.g., J.A. at 312, 317, 324-25.[7]
 
 III
 
 83
 In contrast to these large studies, the "five papers" by Drs. Zaloga, Lake, and others are apparently based on only two studies, each involving strikingly small subject samples usually comprised of the same few participants. The first paper cited by the court, at 973 n. 2, involved only six participants. J.A. at 289. The third paper, at 973 n. 4, involved only sixteen subjects, six of whom were the same subjects who had comprised the first paper's sample. Depo.Tr. at 47. Those same sixteen appear as the identical test sample in the fourth paper, at 974 n. 6, and once again in the fifth paper, at 974 n. 7. Compare Table I, J.A. at 295, with Table II, J.A. at 478, and J.A. at 464 & 473 n. 9.[8] A careful look at the essence of the Zaloga/Lake reported data, in terms of both mean values and individual data points and peak ranges relied on by the authors, reveals that, ultimately, there is no evidence that the ingestion of a standard 75 mg dose of PPA alone produces other than clinically trivial results.
 
 
 84
 * The first paper specifically found that 75 mg of PPA "did not cause clinically relevant hypertension." J.A. at 289. This paper also defined hypertension as blood pressure of 140/90, and noted that some 16 billion doses of PPA are taken annually in the United States, and 20% of the United States population takes over 700 mg of caffeine daily.B
 
 
 85
 The second paper again specifically found that during all the times that the subjects were tested, there were no clinically significant blood pressure rises, though the authors speculated that since they did not test at all times, something could have happened at a time they were not testing--an obvious tautology. The authors even candidly stated: "We conclude that 75 mg of sustained release PPA has only minimal effects ... in young, healthy, normotensive subjects." J.A. at 461. The actual average values show this finding:
 
 
 86
 PLACEBO 75 MG PPA
SUPINE 116/72 117/75
STANDING 110/76 116/80
 
 
 87
 See Table I, J.A. at 460.
 
 C
 
 88
 With the third paper, the story becomes a bit more interesting. The court correctly states that the paper reports that "single doses of PPA may significantly elevate blood pressure, usually at approximately 3 to 4 hours after ingestion." At 973. However, an examination of the full paper reveals additional salient points.
 
 
 89
 First, the paper summarized its "RESULTS," reporting that "significant BP [blood pressure] increases occurred over several hours following 150 mg PPA and after 75 mg PPA plus 400 mg caffeine." J.A. at 294. The word significant, as it is used in this context, means that the increases were "statistically significant" in that the increases, whatever their magnitude, probably did not happen by chance. The summary of "RESULTS" further reported specifically that "[s]ignificant BP increases after ingestion of 75 mg PPA and after 400 mg caffeine were less frequent." Ibid. The "CONCLUSION" section reported only that "150 mg PPA ... substantially elevates BP." As used here, substantially indicates an amount of elevation. Consequently, the "CONCLUSION" ended with the authors' recommendation that physicians inform patients "of the risks of taking more than the recommended amounts of PPA and of combining caffeine with PPA." Ibid. (emphasis added).
 
 
 90
 Second, even an examination of the detailed results shows an inconclusive picture. At J.A. 297, supported by Table II at J.A. 296, we find the statement that the average value for systolic blood pressure (SBP) was "significantly higher" (meaning statistical significance) at Hours 3 and 4; but diastolic blood pressure (DBP) was higher only at Hour 4. On the other hand, the peak value for SBP after 75 mg of PPA was not significantly different from that found after a placebo, but the peak value for DBP was significantly higher. No statement is made as to the clinical relevance of these differences. The magnitude of the change can be seen from Table II, as follows, at Hours 3 and 4, the times with the greatest difference:
 
 
 91
 PLACEBO 75 MG PPA 150 MG PPA
 HOUR 3 124/75 136/85 157/94
 HOUR 4 125/73 134/83 144/88
 
 
 92
 This table shows, even with the tiny number of subjects, which permits greater variability, that 75 mg PPA did not result in average values that were even minimally into the hypertensive range of 140/90, while 150 mg PPA did.
 
 
 93
 Finally, the court notes, at 973, that three subjects taking 75 mg of PPA "had [SBP] readings of 160mm Hg or higher." However, this result is exactly the same as for those taking 400 mg of caffeine and no PPA. J.A. at 297.
 
 D
 
 94
 The fourth paper again used the faithful 16 subjects. As reported by the court, there were increases in both SBP and DBP. However, as the authors themselves noted, "[A]ll peak pressures (including placebo ) were greater than baseline values." J.A. at 481 (emphasis added). "Only the [PPA]-caffeine combination caused a peak [SBP] increase that was significantly greater than that after placebo." J.A. at 480 (emphasis added). Peak DBP changes were significantly higher for all preparations than for the placebo. J.A. at 481.
 
 E
 
 95
 Finally, the fifth paper, again using the same 16 subjects, tested 150 mg PPA, 75 mg PPA with 400 mg caffeine, and simply 75 mg PPA. It produced some interesting quotations that the court relies on. The court states that "all three subject groups experienced three times more blood pressure rises than did the placebo group." At 974 (emphasis added). This apparently is the court's interpretation of a result that applied only to the peak increases in supine blood pressure, and refers to the amount of that peak increase, not how often the increase occurred.
 
 
 96
 Thus, the data in Table I, J.A. at 467, relating to the peak change in supine blood pressure, show increases as follows:
 
 
 97
 PLACEBO 150 PPA 75 k CAFF 75 PPA
SYSTOLIC 13 47 30 24
DIASTOLIC 9 32 25 27
 
 
 98
 However, the article interprets these numbers to mean that three hours after ingestion (previously thought to be a peak time) "only after 150 mg were the differences significant." J.A. at 465-66 (emphasis added).
 
 
 99
 It is significant, moreover, that the figures for standing blood pressure showed much less difference, with average values three hours after ingestion showing the following results:
 
 
 100
 PLACEBO 111/76
150 PPA 116/74
75 PPA 121/81
75 k CAFF 111/79
 
 
 101
 Table II, J.A. at 468. These results show little systematic difference, and in fact show the anomalous result that 150 mg had less effect than 75 mg, and that 75 mg with caffeine had virtually no effect at all. Such results, comprising a random and erratic pattern, might well have been expected from a study using such small numbers and producing such small effects.
 
 
 102
 Finally, the article found that, when standing blood pressure was taken again, at the critical three-hour point, after the subjects stood in place for 5 minutes, "all blood pressures were similar across all four drugs [includes placebo ] and similar to baseline [pre-ingestion] values." J.A. at 466.
 
 
 103
 Nevertheless, the court picks up the authors' language that "some individual peak blood pressures that were reached were worrisome...." At 974 (quoting J.A. at 470-71). However, that conclusion rests on single maximum values that are, almost by definition, anomalous with such a small number of subjects. The full report of the data shows the following absolute maximum supine blood pressure values (the highest SBP for any individual and the highest DBP for any individual, regardless of whether the two recorded amounts were in the same individual and regardless of the pre-testing values for that individual):
 
 
 104
 PLACEBO 172/118
150 PPA 230/140
75 k CAFF 178/120
75 PPA 210/160
 
 
 105
 Table I, J.A. at 467. Again, this examination of single high values shows that much of what is going on is simple random fluctuation. The values for 75 mg alone are much higher than for 75 mg plus caffeine, even though all solid studies show that the addition of caffeine is more effective in raising blood pressure. The DBP reading for 150 mg is lower than the reading for 75 mg. Also, the 75 mg plus caffeine formulation shows essentially the same result as the placebo alone, further undermining any relevance of these erratic numbers.
 
 
 106
 It is very significant that the authors' own "DISCUSSION" section only makes the statement that "our data support previous studies which conclude that [PPA], in doses of only double or triple recommended, elevates supine (but not standing ) blood pressure to clinically significant levels...." J.A. at 470 (emphasis added) (footnotes omitted).
 
 
 107
 Finally, the court quotes a short passage from this study that relates to a 1989 Pentel study not in the record, see J.A. at 471 & 474 n. 24,[9] for the proposition that Pentel had two subjects with "some blood pressure supersensitivity to recommended doses of [PPA]." Without the study being in the record, we have no way of knowing what numbers are implied by "supersensitivity." We also do not know what is meant by "recommended" doses here, especially in light of the analysis of the 1985 Pentel study, see infra at 987, showing that the doses used in that study were much more powerful in effect than the 75 mg PPA that we are concerned with here.
 
 F
 
 108
 Thus, the combined effect of all "five papers," reporting on two studies, involving some or all of the same sixteen subjects in four of the papers and at most fourteen other subjects in the remaining paper, is fully consistent with the much larger studies published by Blackburn, Noble and Liebson: Some PPA probably elevates blood pressure a little, but not much. A lot of PPA, or PPA with caffeine, will raise blood pressure more, and possibly to levels with clinical implications. In fact, the fifth and final Zaloga/Lake paper faithfully records the actual facts: "[PPA] appears to cause some blood pressure elevation in humans.... An oral dose of 75-mg sustained-release [PPA] ... causes statistically significant but clinically trivial blood pressure increases in some studies...." (emphasis added). J.A. at 464. That is what the studies as a whole stand for, and that is not a sufficient basis for Zaloga's opinion. Beyond that, no matter how artfully the authors worded the papers, or how deftly Dr. Zaloga or the court summarizes them,[10] there is nothing but "data dredging" to show a minor effect here or a single anomalous value there.
 
 IV
 
 109
 Next the court turns to Zaloga's reliance on the 1985 Pentel study and the Horowitz study for some exciting quotations. The court cites Pentel as finding "blood pressure rising significantly [apparently meaning "amount," not "statistical significance"--you cannot get statistical significance from "some" individuals] in some individuals after 75 mg doses" with a "greatest individual rise in blood pressure" of 55/35. At 974 & n. 8. Horowitz is cited as saying that "[s]ubjects receiving 85 mg PPA suffered increases in blood pressure" and that "potentially dangerous rises in blood pressure may occur after ingestion of a single capsule of PPA-containing substances and that a report of cerebral hemorrhage after ingestion of 85 mg confirms that these adverse effects may be life-threatening." At 974.
 
 
 110
 However, the court discounts the fact, reported and confirmed in Dr. Zaloga's own papers, that these two studies used much more potent forms of PPA. Pentel used immediate-release rather than timed-release capsules in studying his six subjects, and Horowitz studied a substantially more potent non-racemic isomer[11] of PPA that is not approved for marketing in the United States, rather than the racemic form used in this country.
 
 
 111
 * Both the first and second Zaloga/Lake papers note that Horowitz used dosages that were more potent than the approved 75 mg of PPA, that were delivered in immediate-release form, and that were non-racemic. See J.A. at 291, 458. Remarkably, during his deposition, Zaloga vigorously denied that the Australian Trimolets compound used by Horowitz would translate into approximately the equivalent of 170 mg of PPA in sustained-release form. Zaloga challenged his questioner:
 
 
 112
 I would disagree with that. Unless someone can produce that information for me, I don't believe it.
 
 
 113
 I don't think you can just assume, because it was in a different form or different isomer form, that you can just add them up that way, so I disagree with that.
 
 
 114
 Depo.Tr. at 518-19. Zaloga's contentiousness is surprising because his own co-authored statement, in the second paper cited by the court, specifically says that Horowitz's single 85 mg non-racemic immediate-release capsule was equivalent to 170 mg of the racemic American preparation of PPA. J.A. at 458, 460. See also the third paper, J.A. at 298. Thus, Zaloga himself produced the information that Horowitz used an amount even greater than the greatest amount tested in any of the other studies, and above the value that all agree may produce clinical effects.
 
 B
 
 115
 Pentel's study of three men and three women also used an immediate-release form of PPA, see J.A. at 294 & 299 n. 21, 304, 464 & 473 n. 10, and is referred to in the second Zaloga/Lake paper as "inconclusive" as to PPA's effects on blood pressure. J.A. at 458.[12] The fifth Zaloga/Lake paper cites the Pentel study in noting that 75 mg of immediate-release PPA equates to 150 mg of sustained-release PPA. J.A. at 464.
 
 
 116
 Thus, neither the Horowitz nor the Pentel study shows anything about the kind of 75 mg PPA dose that would have been taken by Bryan Glaser.
 
 V
 
 117
 The final support for Zaloga's conclusion is proffered in the form of adverse case reports, variously reported as 140 to 142. Zaloga appears to be referring to some version of an article by Lake, et al., which is referred to in various of the papers in various ways:
 
 
 118
 * J.A. at 484 n. 16 "Adverse drug effects attributed to [PPA]: a review of 142 case reports. AmJMed [In press]."
 
 
 119
 * J.A. at 473 n. 6 "[Same]. AmJMed 1940 [sic ]; 86:195-208."
 
 
 120
 * J.A. at 299 n. 39 "Adverse drug effects attributed to [PPA]: a review of 140 case reports (submitted for publication)."
 
 
 121
 * Defendant's brief at page 32 refers to the article as:
 
 
 122
 89 Amer.J.Med. 195 (August 1990).
 
 
 123
 Whatever the article's actual citation, it is not in the record. However, Zaloga's discussion at the deposition clearly shows that only 12 or 13 reported incidents involved 75 mg of PPA (and we do not know whether any of these were immediate-release or non-racemic), and he admitted that "some" of those 12 or 13 cases (we do not know how many) involved "combinations with other drugs." J.A. at 391. The only individual cases discernible from the record are the three quoted at 972-73 n. 1 of the court's slip opinion (quoting J.A. at 390). Without more, and without the original reports, these are the rankest type of anecdotal data.
 
 
 124
 In commenting on regulations of the federal Food and Drug Administration (FDA) that state that the agency will not consider "[i]solated case reports, random experience, and reports lacking the details which permit scientific evaluation," 21 C.F.R. Sec. 314.126(e), the Supreme Court has observed that the FDA's exclusion of such anecdotal evidence is amply justified by legislative history that shows "a marked concern that impressions or beliefs of physicians, no matter how fervently held, are treacherous." Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 619 & n. 14, 93 S.Ct. 2469, 2478 & n. 14, 37 L.Ed.2d 207 (1973); E.R. Squibb & Sons, Inc. v. Bowen, 870 F.2d 678, 685 (D.C.Cir.1989); see also Hagaman v. Merrell Dow Pharmaceuticals, Inc., 1987 U.S.Dist. LEXIS 6124 at * 22-24 (D.Kan. June 26, 1987) (discussing reasons that anecdotal drug experience reports are inherently unreliable, unscientific, regarded by the FDA as unhelpful, and difficult for courts to verify). In this case, these three tersely stated anecdotal events certainly cannot support any kind of conclusion as to causation.
 
 VI
 
 125
 The above demolition of the interpretation that Zaloga and the court put on the studies would be ample to support the summary judgment granted here. However, there is more. In casually quantifying the competing "probabilities" as to what may have caused Glaser's fall, Zaloga's numbers are fatally flawed by a diagnostic technique that depends almost wholly on his ignoring the possibility that Glaser fainted. On numerous occasions, Zaloga discusses the case as though we have no reason to believe that Glaser was anything other than a "very athletic person" in the peak of health. Despite the contrary evidence, he disdains any suggestion that Glaser's general state of health at the time was other than optimal:
 
 
 126
 [I]t was my opinion that in a young, healthy individual who had no underlying disease that would have predisposed him to an intercerebral bleed and came into the emergency room with severe hypertension and with a history of taking a compound which is known to cause hypertension and intercerebral bleeds, my personal opinion was that in fact that would be the leading diagnosis in this case.
 
 
 127
 J.A. at 353.
 
 
 128
 So I'm left with a situation of having a relatively young, healthy individual without underlying predisposed disease who suddenly has an intercerebral hemorrhage. In my mind, in that case the most--the thing that I would--would look towards would be use of some kind of a drug that could cause hypertension.
 
 
 129
 J.A. at 362.
 
 
 130
 Also I don't have any evidence presented to me that suggests that he slipped or he fell. He wasn't in line for a prolonged period of time to have le[ ]d to pooling. We have no evidence that he was severely dehydrated or other reason to have fallen.
 
 J.A. at 365.[13]
 
 131
 People just don't walk in and fall and have this kind of a bleed.
 
 
 132
 J.A. at 387.
 
 
 133
 People can faint anywhere, but lots of people are fatigued and never faint as well.
 
 
 134
 So I have no reason to understand why he would have fainted from being fatigued. He had been fatigued for a long period of time and hadn't fainted.
 
 
 135
 J.A. at 388.
 
 
 136
 In short, Zaloga almost always emphasizes that strokes with no apparent reason or precipitating trauma in young, healthy people are rare, and in that case one should look to a drug as a cause. I don't quarrel with that. However, his logic for dismissing as an "apparent reason" a faint due to prolonged standing while wearing a coat inside a hot, crowded room, following weakness from flu and stringent dieting, is without foundation. He is simply wrong about the amount of standing. He has no basis for his comments regarding the temperature conditions in the room at the time. The notion that fainting can be ruled out because many people don't faint, or because this person didn't faint previously, is unsupported conjecture. Indeed, many people don't have intercerebral bleeding. There is no demonstrable basis for the 80%-15% assignment of "probabilities" between PPA and fainting as the cause of bleeding. Rather, the numbers are an extension of the witness's unsupported proffer of personal opinion, unrelated to the scientific method and contrary to the evidence.
 
 VII
 
 137
 A good bit of the disagreement that I have with the court's opinion is in its use, or acceptance of Dr. Zaloga's use, of words such as "cause" and "significantly." In many cases, "cause" is used when what is actually meant is that some effect is associated with, or follows, an earlier stimulus. Thus, Zaloga places enormous weight on a single blood pressure reading of 210 systolic or 160 diastolic after taking PPA. See the court's opinion, at 974. However, as discussed earlier, supra at 985, in the very same study the taking of a placebo was followed by a blood pressure reading of 172/118, well above the hypertension level. Is it sensible to say that this hypertension also was "caused" by the placebo? The short answer is no. The whole point of trials of significant size, and the emphasis on means and standard deviations, is to avoid the temptation to make judgments based on anomalous data.
 
 
 138
 Second, Zaloga makes no attempt to show that the "extreme" values that he reports and emphasizes are anything other than what results from the normal application of the reporting of a mean and a standard deviation. In other words, he does not assert nor attempt to demonstrate that 75 mg of PPA is peculiarly likely to produce extreme values. Finally, even if there were an attempt to demonstrate that 75 mg of PPA could, in some person, somewhere, under some conditions, "cause" an extremely high blood pressure reading, there is no attempt to tie that particular susceptibility to this plaintiff, Bryan Glaser. Again, taking Dr. Zaloga's testimony and this opinion at face value, there would be no reason that any person who faints and suffers damage after taking one of the 16 billion doses of PPA consumed annually in the United States, should not be able to bring his claim to a jury. I do not believe such a result is compatible with the law in our circuit or the decisions of the Supreme Court. I therefore dissent.
 
 
 
 *
 Boggs, Circuit Judge, would grant rehearing for the reasons stated in his dissent
 
 
 [1]
 Dr. Zaloga testified that there was an 80% chance that Bryan's injury was in fact caused by his ingestion of a pill containing, as its sole active ingredient, 75 mg of PPA. He then summarized:
 I think that it is possible for individuals who consume just 75 milligrams of [PPA] to have enough blood pressure elevation that they could sustain a[n] intracerebral hemorrhage.... That's based on our studies which--which show variation in the effect anywhere from a few millimeters of mercury on up. We have a tremendous range there. Then there are numbers of reports in the literature of the ingestion of just 75 milligrams which have resulted in those kinds of bleeds.... Ray Lake recently summarized 140 some cases of adverse reactions. A number of those include intracerebral bleeds which have occurred just after ingestion of 75 milligrams....
 (Depo.Tr. at 134-36). Later in his deposition, Dr. Zaloga was asked about the number of cases of which he was aware of a hemorrhage after ingestion of 75 mgs. of PPA:
 ... I think that there are a number, to the point that it's not even reportable anymore.... In this review of the American literature, there were 142 case reports ... [T]he fact is that one could get 142 cases of an adverse reaction to a drug into the medical literature is a phenomenal report of an adverse consequence from a drug....
 Here's a 35-year-old Dexatrim 75 stroke with resolution. That patient had a stroke--a 20-year-old female, 1.5 hours after ingesting Dexatrim, stroke. We've got another one, Dexatrim 75 milligrams, stroke.
 (Depo.Tr. at 184-85).
 
 
 [2]
 Lake, et. al., A Double Dose of Phenylpropanolamine Causes Transient Hypertension, 85 Am.J.Med. 339 (1988)
 
 
 [3]
 Lake, et. al., The Effects of Phenylpropanolamine on Human Sympathetic Nervous System Function, Neuropsychopharmacology, Vol. 1, No. 2 (1988)
 
 
 [4]
 Lake, et. al., Transient Hypertension after Two Phenylpropanolamine Diet Aids and the Effects of Caffeine: A Placebo-Controlled Follow-Up Study, 86 Am.J.Med. 427 (1989)
 
 
 [5]
 The study (referred to in the dissent at section III.C.) specifically states in its results section:
 After 75 mg of PPA, means for [systolic blood pressures] at Hours 3 and 4 and [diastolic blood pressure] at Hour 4 were significantly higher than those after placebo.
 (J.A. at 297.) Also in the results section of the Fifth paper (referred to in the dissent at section III.E.) the article specifically states:
 Although the means of maximal blood pressure after all drugs, including placebo, were significantly greater than baseline, the peak increases after active drugs were generally 100 percent greater than after placebo.
 (J.A. 465.) The synopsis to the article also summarizes:
 The maximal increases in supine diastolic blood pressure after all three phenylopropanolamine-containing drugs were almost three times that after placebo....
 (J.A. at 463.)
 Not all subjects or even a majority of the subjects in these studies suffered acute blood pressure rises from 75 mg of PPA; but the studies do show, as Dr. Zaloga maintains, the 75 mg of PPA may cause such blood pressure increases in certain individuals.
 
 
 [6]
 Lake, et. al., Phenylpropanolamine increases plasma caffeine levels, Clinical Pharmacol. Ther. 675 (June 1990)
 
 
 [7]
 Lake, et. al., Dose-Dependent Response to Phenylpropanolamine: Inhibition of Orthostasis, J.Clin.Pharmacol 1991; 31: 624-635
 
 
 [8]
 Pentel, Propanolol antagonism of phenylpropanolamine-induced hypertension, Clin.Pharmacol.Ther. Vol. 37, No. 5 (May 1985)
 
 
 [9]
 The dissent maintains that Dr. Zaloga should not have relied on this article because Pentel studied immediate release compounds rather than Dexatrim's sustained release version of the drug. However, Dr. Zaloga was clearly aware of the differences between the two compounds, see infra note 10, and testified regarding the methods used to apply Pentel's results to questions involving sustained release compounds. (Depo.Tr. at 281-85)
 
 
 [10]
 Horowitz, et. al., Hypertensive Responses Induced by Phenylpropanolamine in anorectic and decongestant preparations, The Lancet, January 12, 1980. Dr. Zaloga summarized:
 In my mind, the--the body of literature is very consistent. And that is that the response to [PPA] can be variable, that some individuals in our study, for instance, at 75 milligrams had significant hypertension that I would consider to be adverse.... I think that goes well with Horowitz's and--and some of the other studies that are in the literature. I think it fits in nice with the anecdotal reports which demonstrate clearly that perhaps even lower dosages, but certain[ly] 75 and 150 have been associated with adverse consequences.
 (Depo.Tr. at 271). The dissent also dismisses Dr. Zaloga's reliance on this paper because it argues that Horowitz was studying a different type of PPA compound. Again, Dr. Zaloga acknowledged that the PPA isomer studied by Horowitz was different from that contained in Dexatrim but explained his understanding of their differences and the extent to which he could rely on Horowitz's conclusions. (Depo.Tr. at 156-60).
 
 
 [11]
 The dissent does not challenge the validity, reasoning or methodology of any of the studies on which Dr. Zaloga relies but concludes that the studies do not support Dr. Zaloga's testimony. The dissent's reliance on mean values reported in the studies rather than on the individual data points and ranges on which Dr. Zaloga relies and its citation to only minor portions of the results of the studies illustrate Dr. Zaloga's criticisms of the other studies and the possibility of missing significant or extreme results by the use of averages. For example, Dr. Zaloga explains that many studies report their results only in terms of mean (average) and do not provide variances, individual data points, standard error bars or ranges:
 It's unlikely that that would be statistically significant when you average them all together. Therefore averages can really hide clinically significant differences to things.... What I'm discussing here are variations from the mean that could influence one or two patients....
 (Depo.Tr. at 153-54, 501-05). He also explains that some studies on which the defendant relies did not do toxicity studies on the drug, studies he believes are necessary to the reliability of the results. (Depo.Tr. at 228). Dr. Zaloga's decision to rely on certain studies rather than others, his reasoned explanation for his decision and the differences of opinion among the medical experts on these questions create material questions of fact for the ultimate fact finder and preclude summary judgment.
 
 
 [12]
 During the deposition, defense counsel asked whether the facts surrounding this incident, including standing in line, being fatigued, possibly having the flu, etc., could have lead Bryan to faint. Dr. Zaloga stated:
 I think it's possible, but very unlikely. We have people like that all the time.... I can't say that [fainting] didn't do it, but my estimate is that the probability of that is much less than the probability that something else induced an event which created the fall.... [M]y estimation, putting everything together--everything that I know about the case, the history of his ingestion ... I think that the probability that that was related to [another] problem is much greater than just a faint ... out of nowhere, so to speak.
 (Depo.Tr. at 182-84).
 
 
 [13]
 Dr. Zaloga stated:
 It's the coup-contra-coup mechanism. It doesn't exactly normally look like this, but it could. Usually this is a bruising as the brain swings back and forth inside the skull. And we tend to see more of a bruise than a pure deep--more deep-seated bleed....
 I would think hitting [on the right back side of the head] would have him bruising up on the surface of the right frontal brain. To go across the mid line and into the other side is a less likely case for bruising.
 [I]t's all of a statistical thing ... what do I think the probabilities are. I think it's more probable that it occurred the other way around.
 (Depo.Tr. at 207-210).
 
 
 [14]
 Dr. Zaloga explained:
 The reason I believe the bleed preceded the fall, ... I'm considering the history of his ingestion--at least the history we have that he took Dexatrim, the fact that this compound is a compound based on our studies and the literature known to elevate blood pressure, that this could have--and associated with intercerebral hemorrhage, that the time course of his intercerebral bleed would fit well with the known pharmacokinetics and--and physiologic effects of the drug, and that this is a young individual who had no other ... immediate cause for his injuries.
 I'm putting that together and saying that I believe ... the most probable cause ... is an ingestion of a drug that led to the bleed, that led to the fall.
 We have physical evidence of a bleed by his clinical state. We have evidence on the CT scans. And we have the material removed by the surgeon at the time he went in of brain tissue showing necrotic areas within it consistent with a bleed within the brain tissue.
 My personal opinion is we have unrefutable evidence beyond any doubt at all that this patient had a left frontal bleed.... My opinion is that the bleed came first.... It fits the known effect ... of this drug which could lead to a fall in a patient of this age who had some pre-monitory symptoms observed by the teller, a history of known ingestion.
 And we have no other reason, based on his angiogram and others, to show intracranial pathology. And young people of this age just do not have de novo incidences like this.
 So my opinion is that, in my mind, I would put the most likely cause for this injury to have been an intercerebral bleed which caused the fall, rather than some other event.
 (Depo.Tr. at 297-300).
 
 
 [15]
 Dr. Zaloga described this process as a ranking process used to determine things which may cause a specific clinical problem. The doctor considers all information specific to the case to rule out possible causes and determine the most probable cause(s) of the injury. In Hines v. Consolidated Rail Corp., 926 F.2d 262 (3d Cir.1991), the term was explained as "a process whereby medical doctors experienced in diagnostic techniques provide testimony countering other possible causes ... of the injuries at issue." Id. at 270 n. 6 (citing In re Paoli Railroad Yard PCB Litigation, 916 F.2d 829, 849 (3d Cir.1990))
 
 
 [16]
 Dr. Zaloga explained:
 So the basis then of the ... whole thing would be what caused the intercerebral bleed. The most common things that we see producing them would be, number one, somebody with severe underlying CNS or central nervous system disease.
 So someone who had previous strokes ... would ... be predisposed to that--which [Bryan] was not. So we ... would rule that out as a possible cause.
 We would consider severe hypertension that was untreated as the cause ... but we have a reason to believe that he did not have severe hypertension based on his previous visits to physicians and with no history of that.
 So we would say this is a normotensive, healthy individual who suddenly developed this intercerebral bleed.
 My next consideration was whether he had undiagnosed underlying disease of the brain.... Again, with the CAT scans and arteriogram we have no evidence of that being a predisposing condition....
 So I'm left with a situation of having a relatively young, healthy individual without underlying predisposed disease who suddenly has an intercerebral hemorrhage. In my mind, in that case ... the thing that I would ... look towards would be use of some kind of a drug that could cause hypertension.... And in my mind, [PPA] would go in that class.
 Dr. Zaloga concluded that, based on Bryan's medical history, symptoms, history of PPA ingestion, and no evidence of the other possible causes, Dexatrim most likely caused the intercerebral bleed. (Depo.Tr. at 65-70).
 
 
 [17]
 Bryan was taking a "slow release" or "sustained" version of Dexatrim. Dr. Zaloga testified that as the drug enters the system, sustained release compounds cause higher blood pressure levels than immediate release compounds. He also explained that studies have shown that blood pressure rises caused by sustained release compounds generally do not occur until approximately two hours after ingestion and that once blood pressure rises, it may remain elevated for three hours or more. (Depo.Tr. at 132, 148-50)
 
 
 [18]
 See Shafer, The Construction of Probability Arguments, 66 B.U.L.Rev. 799 (1986) (discussing how objective probability analysis is generally unrealistic and deceptive in actual legal cases, given the subjectivity involved in breaking down real-life problems, relating the problems to statistical models which simulate reality, assigning numerical probability factors, and deciding on a level of generality or particularity to state the problems and answers)
 
 
 [19]
 The dissent seems to imply that the emergency room physician and other treating doctor's diagnoses are inconsistent with or contrary to Dr. Zaloga's opinion on this question. However, the emergency room physician specifically testified that no effort was made to determine the cause of what they assumed was a fainting episode and admitted that he never attempted to make a pathological diagnosis of the cause of Bryan's intracranial bleed. (Dr. Bodzin Depo.Tr. at 22-23)
 
 
 [20]
 As stated at the outset of this opinion, our holding as to causation carries no implications regarding the plaintiff's other burdens of proof on the negligence and breach of warranty claims
 
 
 [1]
 A typical cup of coffee contains approximately 100 mg of caffeine. See Rudolf Noble, "A Controlled Clinical Trial of the Cardiovascular and Psychological Effects of Phenylpropanolamine and Caffeine," 22 Drug Intelligence & Clinical Pharmacy 296, 298 (1988), reprinted in Joint Appendix at 318
 
 
 [2]
 Dr. Zaloga's fee for consulting in this case has been $200 per hour. Depo.Tr. at 20
 
 
 [3]
 The teller, Jaqueline Kulchycki, had been deposed on June 24, 1992. J.A. at 426. While he was being deposed on July 27, 1992, Zaloga confirmed that he had read the transcript of Kulchycki's deposition. Depo.Tr. at 36
 
 
 [4]
 Dr. Zaloga did not explain how, without "any evidence presented to me that suggests that he slipped or he fell," he assigned a 15% probability to such an event
 
 
 [5]
 "I think it's possible--I--I mean, one--two [doses] would be more likely, but I think the possibility--if he had two [doses], I would say his--his probability is much higher--say, 90 percent. Having ingested one [dose], my idea of his probability would be somewhat lower--at, say, 80 percent." Depo.Tr. at 203-04 (emphasis added)
 
 
 [6]
 Although Dr. Bodzin did not determine what caused the fall, he did conclude that the bleeding in Glaser's brain was caused by the trauma to his head upon falling. Bodzin Depo.Tr. at 31, reprinted in J.A. at 199
 
 
 [7]
 It should be noted that a study can report "blood pressure" in at least 8 different ways, depending on whether the systolic (first or higher number) or the diastolic (second or lower number) is considered, then whether the subject is "supine" (lying down) or standing, and whether mean or maximum values for a group are reported. This allows a great deal of picking and choosing for a data analyst witness. See, e.g., Liebson, J.A. at 321 ff
 
 
 [8]
 As to the second paper, at 973 n. 3, which reported on a sample of fourteen, it is not clear who these subjects were, but Zaloga stated that his group conducted only two studies. J.A. at 355
 
 
 [9]
 This is not the Pentel study referred to in the court's opinion, at 974 n. 8, which is a 1985 study. See infra Sec. IVB
 
 
 [10]
 At one point during his deposition, Zaloga attempted to distinguish his papers from the Blackburn, Noble, and Liebson studies by saying that "they never did toxicity studies. I believe that 75 milligrams [of PPA] itself has toxicity to it in a small number of patients. In my mind, doubling the dose would create toxicity in the majority of patients. And I'm going to just say I think it would cause it in close to a hundred percent, because our studies suggest every patient who we gave 150 milligrams to developed unacceptable hypertension, in my opinion." Depo.Tr. at 228 (emphasis added). The court cites this testimony. At 975 n. 11
 Zaloga does not indicate what he means by "toxicity studies," nor does he indicate that he performed any such studies that the other authors did not.
 
 
 [11]
 In Dr. Zaloga's words, an isomer is an analog whose bonds can be shifted in two directions called "L" and "D." Depo.Tr. at 157. Although he says that he knows of no published evidence that the Australian non-racemic isomer has more activity than does the racemic isomer that is approved for sale in the United States, his own co-authored studies indicate otherwise
 
 
 [12]
 In his deposition, Zaloga now suggests that sustained-release doses of PPA can cause greater elevations in blood pressure than immediate-release doses, Depo.Tr. at 130-32, just as he now claims that the Horowitz non-racemic isomers produce effects that are indistinguishable from racemic isomers. See supra Sec. IV A. However, as with the Horowitz isomers, Zaloga's own co-authored studies contradict the thrust of his deposition testimony. Therefore, the fact that he is "clearly aware of the differences between the two compounds," as the court notes, at 974 n. 9, does not lend greater credence to his testimony
 
 
 [13]
 It will be recalled that the teller testified that Glaser had been standing in a line with a 20-25 minute wait, wearing a coat inside a hot, stuffy, crowded bank lobby after coming in from a January day. J.A. at 427-28. He came to the bank immediately after being diagnosed with post-viral syndrome and an immediate history of flu-like symptoms, during a time when he was eating poorly. J.A. at 154-64